McINTYRE SQUARE ASSOCIATES

v.

William J. EVANS, an individual, and Garfield M. Grant, an individual

v.

Garfield M. Grant, an individual, Appellant,

v.

James A. Hengelsberg, an individual, Appellant.

McIntyre Square Associates

v.

James A. Hengelsberg and Mildred Hengelsberg, husband and wife, Appellants.

First City Company, Cross–Appellant,

v.

William J. Evans, an individual, and Garfield M. Grant, an individual, Cross–Appellees,

v.

Garfield M. Grant, Third Party Plaintiff, and James A. Hengelsberg, an individual, Third Party Defendant,

First City Company, Cross–Appellant,

v.

James Hengelsberg and Mildred Hengelsberg, husband and wife, Cross–Appellees.

Superior Court of Pennsylvania.

Argued Dec. 4, 2002.
Filed May 30, 2003.

Christopher R. Opalinski and William B. Pentecost, Jr., Pittsburgh, for Grant and Hengelsberg.

Thomas M. Hardiman, Pittsburgh, for McIntyre Square and First City.

BEFORE: HUDOCK, TODD, and GRACI, JJ.

OPINION BY TODD, J.:

¶ 1 In these consolidated cross-appeals, we are asked to address both procedural and substantive issues in an action against sureties on a commercial lease, following the default of and confession of judgment against the tenant on the lease. The sureties appeal judgment against them and the landlord cross-appeals. We reverse and remand.

¶ 2 In 1991, Professional Male Inc. d/b/a Professional Male ("Professional Male") entered into a commercial lease with McIntyre Square Associates ("McIntyre Square") for space in the McIntyre Square Shopping Center in the North Hills of Pittsburgh, Pennsylvania. The lease, which was executed on behalf of McIntyre Square by its property management agent, First City Company ("First City"), had a 5–year term, and did not contain an option to extend or renew. Several months after the lease was executed, William J. Evans, James A. Hengelsberg, and Garfield M. Grant, officers and owners of Professional Male, and Mildred Hengelsberg, Hengelsberg's wife, (collectively "Guarantors") signed a Guaranty Agreement personally guaranteeing Professional Male's obligations under the lease.

¶ 3 On February 15, 1996, Evans, as president of Professional Male, executed a Lease Amendment and Extension Agreement, extending the lease another 5 years, and significantly increasing the rent. It is disputed that Grant also signed the extension, and undisputed that Hengelsberg did not. No new guaranty agreement was signed

¶ 4 In 1998, Evans resigned as president of Professional Male and Hengelsberg stepped in. Professional Male later defaulted on its lease and vacated the premises on March 1, 1999. As provided in the lease, on behalf of McIntyre Square, First City confessed judgment against Professional Male for $187,811.43 for this default. A petition to open that judgment was later filed by Professional Male, but denied. On March 31, 1999, First City, again as agent for McIntyre Square, sued Evans and Grant, and then on May 3, 1999, sued the Hengelsbergs, in each case alleging that they were liable for Professional Male's breach under the Guaranty Agreement.[1]

Grant also sued James Hengelsberg for claims arising from an indemnity agreement. All these cases were consolidated in April 2000.

¶ 5 The parties filed cross motions for summary judgment. A central issue in these motions was whether the Guaranty Agreement, signed by Evans, Grant, and the Hengelsbergs in conjunction with the original lease, applied to the lease extension. The motions were heard by the Honorable Patrick McFalls of the Court of Common Pleas of Allegheny County, and were denied.

¶ 6 Trial was set for September 19, 2000 before Judge McFalls. On that day, in chambers, the trial court ruled on the parties' motions *in limine*. As we will discuss more fully below, Guarantors moved to preclude introduction of the confessed judgment against Professional Male as evidence of First City's damages, and First City moved to prohibit Guarantors from relitigating the same issue. In each case, the trial court ruled against First City, refusing to give preclusive effect to the confessed judgment regarding the liability of Guarantors. (N.T. Trial, 9/19/00, at 7–9.)

¶ 7 The trial court, still in chambers, then *sua sponte* ruled that, as a matter of law, the Guaranty Agreement *did* cover the lease extension, effectively reversing its prior summary judgment ruling. Having effectively granted summary judgment to First City and against Guarantors as to liability, the court ordered a trial on damages only, and a nonjury trial commenced that same day.

¶ 8 On October 2, 2000, the trial court issued its verdict. Preliminarily, it *sua sponte* substituted McIntyre Square for First City as the real party in interest, and

---

1. Evans, however, did not contest this suit, and is not a party to the present appeals.

then issued a non-jury verdict in favor of McIntyre Square and against Guarantors for $49,643.89, plus post-verdict interest, and ruled in favor of Grant in his indemnity suit against James Hengelsberg.[2] On May 7, 2001, post-trial motions were denied, and judgment was entered in favor of McIntyre Square.

¶ 9 Guarantors appealed, and First City cross-appealed. Although the parties were ordered to, and did, file concise statements of matters complained of on appeal pursuant to Rule 1925 of the Pennsylvania Rules of Appellate Procedure, no trial court opinion was filed.[3]

¶ 10 On appeal, Guarantors ask:

1. Whether the trial court erred by *sua sponte* granting judgment for the Plaintiff on the morning of trial, after the jury was selected?

2. Do material changes in a document captioned "Lease Amendment and Extension Agreement" constitute a new and different lease agreement such that guarantors of the first lease do not guaranty the second?

3. Whether gratuitous guarantors cease to be liable under a lease when the terms and duration of the lease are changed without their notice?

(Appellants' Brief at 4.) In its cross-appeal, First City asks:

1. Is a duly authorized property management agent a proper party plaintiff in an action for breach of lease when the agent disclosed its representative capacity in the caption and the body of its Complaint?

2. Can a guarantor re-litigate a confessed judgment entered against his guarantee corporation after he unsuccessfully challenged the validity of the confessed judgment?

3. Is a party entitled to reasonable attorneys' fee and expenses incurred in connection with enforcing a guaranty that specifically provides for reimbursement of those fees and expenses?

(Cross–Appellant's Brief at 4.)

¶ 11 In their first issue, Guarantors argue that, as a procedural matter, the trial court erred in *sua sponte* granting judgment as to liability to First City on the morning of trial, after the jury was selected, and assert that their due process rights were thus violated.[4] We conclude that Guarantors' due process rights were protected.

¶ 12 The parties' summary judgment motions, which the trial court had earlier denied, fully addressed the issue of whether the Guaranty Agreement signed by Guarantors applied to the lease extension. Thus, Guarantors cannot argue that they were surprised by the motion, in the sense that they did not have the ability to fully respond to it, which is the basis of the cases on which Guarantors rely. *See, e.g., Cagnoli v. Bonnell,* 531 Pa. 199, 611 A.2d 1194 (1992) (vacating trial court's grant of motion for judgment on pleadings made on the morning of trial after the jury had been empaneled, finding that court's last

---

**2.** Grant's indemnity claim against James Hengelsberg was later discontinued.

**3.** As Judge McFalls was unavailable, the case was forwarded to this Court without an opinion.

**4.** Guarantors made a fleeting reference to this argument in their post-trial motion, stating "[b]y making its erroneous ruling, this Court effectively denied the Hengelsbergs' and Mr. Grant's right to trial by jury as to liability without due process of law." (Defendants' Motion for Post–Trial Relief, 10/13/00, at 6.) There is, however, no elaboration on this argument in their brief filed in support of the post-trial motion.

minute action denied appellant a full and fair opportunity to argue against the motion). Here, the issue was fully briefed and discussed, thus *Cagnoli* and related cases are inapplicable. The trial court's action was more akin to a reconsideration of its prior motion, which, although *sua sponte,* we find to be unobjectionable, and, indeed, promoting of judicial economy.[5]

¶ 13 In their next two issues, Guarantors assert that the trial court erred in concluding that they were liable to First City upon the basis of the Guaranty Agreement executed in 1991.[6] They make two alternative arguments in this regard. First, they argue that the terms of the lease under the "Lease Amendment and Extension Agreement" were so different from the original lease that it constituted a wholly new, second lease to which the Guaranty Agreement did not apply. Second, they assert that under the Guaranty Agreement they did not consent to material modifications in the lease that might materially increase their risk. We will address this second argument first because we find it to be dispositive.

¶ 14 The Guaranty Agreement obligated Guarantors to fulfill Professional Male's obligations under the lease upon Professional Male's default.[7] (Guaranty Agreement, 10/8/91, at ¶ 1.) Guarantors contend, however, that the trial court erred in concluding that they were bound as sureties for the amended lease, asserting that the amended lease materially in-

---

**5.** In a variation on their due process argument, Guarantors assert that First City, at the in-chambers hearing, for the first time argued an additional basis for the trial court's action: that Guarantors, through admissions in their pleadings, effectively had waived any argument that the Guaranty Agreement did not cover the amended lease. (Reply Brief of Appellants at 3–4.) Assuming that this oral motion for judgment on the pleadings was the sole basis for the trial court's ruling just prior to trial, and that is questionable although unclear from the transcript of the hearing (*see* N.T. Trial, 9/19/00, at 4–28), the Guarantors raised this variation on their due process argument for the first time in their reply brief on appeal. Thus, it has been waived. *See Commonwealth v. Lopata,* 754 A.2d 685, 689 (Pa.Super.2000) ("A claim which has not been raised before the trial court cannot be raised for the first time on appeal.").

**6.** The trial court's decision in this regard, on the morning of trial, was essentially a grant of summary judgment to First City on liability. Our scope of review of an order granting or denying a motion for summary judgment is well established:

> We view the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. Only where there is no genuine issue as to any material fact and it

is clear that the moving party is entitled to a judgment as a matter of law will summary judgment be entered. Our scope of review of a trial court's order granting or denying summary judgment is plenary, and our standard of review is clear: the trial court's order will be reversed only where it is established that the court committed an error of law or abused its discretion.

*Pappas v. Asbel,* 564 Pa. 407, 418, 768 A.2d 1089, 1095 (2001) (citations omitted), *cert. denied,* 536 U.S. 938, 122 S.Ct. 2618, 153 L.Ed.2d 802 (2002).

**7.** Although denominated as a "guaranty" agreement, the Guaranty Agreement, which allowed the landlord to seek payment from Guarantors immediately upon Professional Male's default, without first pursuing remedies against Professional Male (*see id.* at ¶ 3), is most properly categorized as a surety agreement. While both guaranty and surety agreements are agreements to be liable for the debt of another, the principal difference is that the creditor may look to the surety for immediate payment upon the debtor's default, without first attempting to collect the debt from the debtor, whereas the creditor must first seek payment from the debtor before going after a guarantor. *See Reuter v. Citizens & Northern Bank,* 410 Pa.Super. 199, 208 n. 3, 599 A.2d 673, 678 n. 3 (1991); *see generally* Summary of Pennsylvania Jurisprudence 2d, Commercial Law, §§ 6.1, 6.2 & 6.4.

creased their risk under the Guaranty Agreement without their consent, thus discharging them.

■ ¶ 15 In *Reliance Ins. Co. v. Penn Paving, Inc.,* 557 Pa. 439, 734 A.2d 833 (1999), our Supreme Court, quoting an earlier decision from this Court, explained the principle on which Guarantors rely:

> Cognizant of the problems posed by the three-party composition of suretyships, Pennsylvania courts have uniformly recognized that where the creditor and the debtor materially modify the terms of their relationship without obtaining the surety's assent thereto, the surety's liability may be affected. A material modification in the creditor-debtor relationship consists of a significant change in the principal debtor's obligation to the creditor that in essence substitutes an agreement substantially different from the original agreement on which the surety accepted liability. Where, without the surety's consent, there has been a material modification in the creditor-debtor relationship, a gratuitous (uncompensated) surety is completely discharged. A compensated surety is discharged only if, without the surety's consent, there has been a material modification in the creditor-debtor relationship and said modification has substantially increased the surety's risk.

*Id.* at 449–50, 734 A.2d at 838 (quoting *Continental Bank v. Axler,* 353 Pa.Super. 409, 415–16, 510 A.2d 726, 729 (1986)); *see also* Restatement of Security, § 128 ("Where, without the surety's consent, the principal and the creditor modify their contract otherwise than by extension of time of payment (a) the surety, other than a compensated surety, is discharged unless the modification is of a sort that can only be beneficial to the surety, and (b) the compensated surety is (i) discharged if the modification materially increases his risk ....."). Here, we conclude that Guarantors were compensated sureties.[8]

■ ¶ 16 Nevertheless, "material modifications in the creditor-debtor relationship will not serve to discharge the surety where the surety has given prior consent to such material modifications as part of the suretyship contract." *Id.* at 450, 734 A.2d at 838. To determine "whether a surety has consented to a material modification, the suretyship 'contract must be given effect according to its own expressed intention as gathered from all the words and clauses used, taken as a whole, due regard being had also to the surrounding circumstances.' " *Id.* (quoting *Continental Bank,* 353 Pa.Super. at 417, 510 A.2d at 730).

■ ¶ 17 We agree, as Guarantors assert, that the amended lease was a material modification of the original lease which substantially increased their risk. The original lease was for a 5 year term and the amendment extended the lease term for an additional 5 years. Obviously, this doubling of the lease term substantially increased Guarantors' exposure under the Guaranty Agreement. Furthermore, the original lease had no renewal provision—it consisted of a single 5 year term—so it cannot be argued that Guarantors could

---

8. Although Guarantors assert that they were uncompensated/gratuitous sureties, and therefore should be discharged from liability for *any* material modification of the underlying lease, we find they that their status as officers and owners of Professional Male when making the guarantee indicates that they were compensated. *See J.F. Walker Co., Inc. v. Excalibur Oil Group,* 792 A.2d 1269, 1274 (Pa.Super.2002) (disagreeing that the sole shareholder in a corporation is "uncompensated" when, in exchange for his guarantee, a creditor extends a line of credit to the corporation in which he owns all shares; concluding that such a surety is not gratuitous).

have anticipated, or implicitly consented to, an extension of the lease term.

¶ 18 The question remains, then, whether under the Guaranty Agreement Guarantors assented to material modifications to the lease that substantially increased their risk. They contend that they did not. First City contends, on the other hand, that "the language of the Guaranty Agreement which [Guarantors] signed clearly indicates that they in fact did consent to guarantee any material changes to the Lease Agreement" (Response Brief for Cross–Appellant at 12), and cites to two sections of Paragraph 2 of the Guaranty Agreement:

2. *No Discharge of Guaranty*—The liability of any Guarantor hereunder shall not be impaired, released, terminated or discharged, in whole or in part, by any of the following, notwithstanding that the same are made with or without notice to the Guarantor:

(a) *any amendment or modification of the provisions of the Lease Agreement;*

(b) any extensions of time for performance, whether in whole or in part, of the covenants of Lessee under the Lease Agreement given prior to or after default thereunder;

(c) any other Guaranty now or hereafter executed by any Guarantor or any other person;

(d) any waiver of, assertion of enforcement of, or failure or refusal to assert or enforce, in whole or in part, any covenants, claims, causes of action, rights, or remedies that Lessee may, at any time, have under the Lease Agreement or with respect to any guaranty or any security that Landlord may hold, at any time, for or under the Lease Agreement or with respect to Lessee;

(e) *any act, thing, omission or delay to do any act or thing that may, in any manner, or to any extent, vary the risk of Guarantor or that would otherwise operate as a discharge of any Guarantor as a matter of law;*

(f) the failure to give any Guarantor any notice whatsoever; or

(g) the release of any security, Guaranty, or any rights, power, or privileges Landlord may now or hereafter have against any persons, entity, or collateral.

(Guaranty Agreement, 10/8/91, at ¶ 2 (emphasis added).) We disagree.

■ ¶ 19 Subpart a of Paragraph 2, providing that "any amendment or modification of the provisions of the Lease Agreement" shall not discharge a guarantor, is ineffective to bind Guarantors regardless of whether or not this language is read to include *material* modifications, as it says nothing about modifications that increase a guarantor's *risk* as required under *Reliance Ins., supra* and *Continental Bank, supra.*

■ ¶ 20 More noteworthy is subpart e, which First City asserts explicitly incorporates Guarantors' assent to changes that increase (or, rather nonsensically, decrease) their risk. It provides that Guarantors are not discharged by "any act, thing, omission or delay to do any act or thing that may, in any manner, or to any extent, vary the risk of Guarantor or that would otherwise operate as a discharge of any Guarantor as a matter of law." (Guaranty Agreement, 10/8/91, at ¶ 2(e).) First City contends that the phrase "vary the risk" covers increased risk to Guarantors, and standing alone perhaps it would. First City ignores, however, the qualifying language at the end of this phrase: "or that would *otherwise* operate as a discharge of any Guarantor as a matter of law." *Id.* (emphasis added). Black's Law Dictionary defines "otherwise" as "[i]n a different manner; in another way, or in other ways". Blacks Law Dictionary 1101 (6th Edition 1990); *see also Bateman v. Motorists Mut. Ins. Co.,* 527 Pa. 241, 246,

590 A.2d 281, 283 (1991) (defining "otherwise" as "in a different way or manner"). This meaning, when inserted into subpart e, reads "any act, thing, omission or delay to do any act or thing that may, in any manner, or to any extent, vary the risk of Guarantor or that would *in a different manner* operate as a discharge of any Guarantor as a matter of law." Read this way, the entire phrase appears to refer to any condition that discharges a guarantor as a matter of law, one way or another. In the narrowest sense, this may refer to errors of procedure that might extinguish a guarantor's obligations under the agreement. In the broadest sense, this phrase could been seen as an attempt to eliminate any defense or argument that would relieve Guarantors of liability as, in some sense, application of any legal principle to the interpretation of a contract that thereby releases a party "operate[s] as a discharge . . . as a matter of law".[9]

¶ 21 Accordingly, we find that the use of "otherwise" in subpart e creates an ambiguity regarding whether or not Guarantors, by this language, guaranteed material changes in the lease that increased their risk, as First City contends.[10] *Cf. Bateman*, 527 Pa. at 246, 590 A.2d at 283 (finding phrase "[a]ny amounts otherwise payable for damages under" an insurance policy was ambiguous where there were no other payments payable under the insurance contract). Because we find the phrase to be ambiguous, we conclude that the trial court erred in determining, as a matter of law, that Guarantors were bound under the Guaranty Agreement to guarantee the lease extension. As a result, judgment against Guarantors must be reversed and the case remanded for further proceedings. Further, because of our resolution of this issue, we need not address Guarantors' alternative argument that the amended lease constituted an entirely new lease.

¶ 22 We now address those issues raised in First City's cross-appeal which have not been rendered moot by our resolution of Guarantors' appeal. First City initially contends that the trial court erred when it *sua sponte*, by order dated October 2, 2000, substituted McIntyre Square in place of First City in the caption.[11]

---

9. While such an interpretation would seemingly swallow the whole agreement, in referring to this provision, First City seems to make just such a sweeping argument: "Guarantors now argue that, under their theory of the caselaw discussed above [*Reliance, supra,* and other cases], their liability is discharged as a matter of law. However, by the plain language of the Guaranty Agreement they have specifically waived the very defense upon which they are attempting to rely." (Response Brief for Cross–Appellant at 15.)

10. In considering whether contract language is ambiguous, it is well-settled that:

A contract contains an ambiguity "if it is reasonably susceptible of different constructions and capable of being understood in more than one sense." This question, however, is not resolved in a vacuum. Instead, "contractual terms are ambiguous if they are subject to more than one reasonable interpretation when applied to a particular set of facts." In the absence of an ambiguity, the plain meaning of the agreement will be enforced. The meaning of an unambiguous written instrument presents a question of law for resolution by the court.
*Murphy v. Duquesne Univ. Of The Holy Ghost,* 565 Pa. 571, 591, 777 A.2d 418, 430 (2001) (citations omitted).

11. The order states:

AND NOW, to wit, this 2nd day of October, 2000, this member of the Court having heard the above-captioned matter without a jury and finding that the real party plaintiff in interest is McIntyre Square Associates, and pursuant to Pa.R.C.P. 2002(a), it is hereby ORDERED that McIntyre Square Associates shall be, and it hereby is, substituted in place and stead of First City Company, and the caption of this case and all pleadings herein henceforth shall be

First City asserts that, as the duly authorized property management agent for McIntyre Square, it was a proper party plaintiff in an action for breach of lease where it had disclosed its representative capacity in the caption and the body of the complaint. We agree.

¶ 23 Rule 2002 of the Pennsylvania Rules of Civil Procedure provides:

**Rule 2002. Prosecution of Actions by Real Parties in Interest. Exceptions**

(a) Except as otherwise provided in clauses (b), (c) and (d) of this rule, all actions shall be prosecuted by and in the name of the real party in interest, without distinction between contracts under seal and parol contracts.

(b) A plaintiff may sue in his or her own name without joining as plaintiff or use-plaintiff any person beneficially interested when such plaintiff

(1) is acting in a fiduciary or representative capacity, which capacity is disclosed in the caption and in the plaintiff's initial pleading; or

(2) is a person with whom or in whose name a contract has been made for the benefit of another.

(c) Clause (a) of this rule shall not apply to actions where a statute or ordinance provides otherwise.

(d) Clause (a) of this rule shall not be mandatory where a subrogee is a real party in interest.

Pa.R.Civ.P. 2002. First City asserts that under subsection (b)(1), it was entitled to sue, as the agent for McIntyre Square, on McIntyre Square's behalf. We note that, in accordance with subsection (b)(1), First City's role as agent was indicated both in the caption of its complaint, and in its initial pleading. (Complaint, 5/3/99, Caption & ¶ 1.) The trial court erred, therefore, in ordering the caption to be changed. While the real party in interest is McIntyre Square, the party named on the lease,[12] and while McIntyre Square will be bound by the outcome of the litigation, Rule 2002(b)(1) clearly allows First City to sue on their behalf. *See Craig by Boosel v. Farren,* 700 A.2d 543 (Pa.Super.1997) (grandparents of alleged property owner could bring replevin action as owner's attorneys-in-fact against owner's parents to recover property allegedly in parents' possession: grandparents were acting in representative capacity; both caption and complaint correctly disclosed their capacity; and real party in interest would be bound by determination rendered). We therefore reverse the trial court's order of October 2, 2000 altering the caption and, on remand, instruct the trial court to correct the caption accordingly.

¶ 24 First City next contends that the trial court erred in not giving preclusive effect to First City's confessed judgment against Professional Male regarding the extent of First City's damages under the Guaranty Agreement, thus allowing Guarantors to re-litigate the damages.

---

deemed amended to reflect this substitution.
(Trial Court Order, 10/2/00.) It should be noted, however, that there has never been a dispute that McIntyre Square, as the landlord named on the lease, was the real party in interest.

**12.** We have held that "[a] real party in interest in any given contract or chose in action is the person who can discharge the duties created and control an action brought to enforce rights." *Craig by Boosel v. Farren,* 700 A.2d 543, 545 (Pa.Super.1997).

Because this issue is capable of repetition on remand, we will review it. *See Estate of Kofsky,* 487 Pa. 473, 480, 409 A.2d 1358, 1361 (1979).

¶ 25 On the morning of trial, the trial court granted Guarantors' motion *in limine* and prohibited First City from introducing its confessed judgment against Professional Male for $187,811.43 to establish its damages against Guarantors. Guarantors were thus allowed to offer evidence of the damages caused by Professional Male's breach of the lease, and a verdict was ultimately entered against Guarantors for $49,643.89, plus · post-verdict interest. First City asserts that the confessed judgment should have been given preclusive effect regarding its damages against Guarantors.

¶ 26 In this regard, First City cites to cases from the Supreme Court and this Court, reaching back almost 200 years, for the proposition that a surety is bound by a determination of the principal's liability. (*See* Cross–Appellant's Brief at 11–12.) A review of these cases, as well as our own research, however, leads us to conclude that the confessed judgment obtained by First City against Professional Male is not binding on Guarantors in First City's suit against them.

¶ 27 Most of the decisions on which First City relies belong to a narrow category of cases concerning sureties on official, or "good faith," bonds. These bonds ensure the performance of official or fiduciary duties [13] and, regarding such bonds, a long line of cases from this Commonwealth support the contention that a surety is bound by a determination of the principal's liability. *See Pennsylvania Turnpike Com'n v. United States Fidelity & Guaranty Co.*

412 Pa. 222, 194 A.2d 423 (1963) (turnpike commissioner's bond; criminal liability of principal determines surety's liability on principal's official bond); *Commonwealth, to Use of Ulshofer v. Turner,* 340 Pa. 468, 17 A.2d 352 (1941) (notary public's bond; judgment against principal is conclusive against surety as to principal's misconduct and resulting damages); *Commonwealth, to Use of Carman v. Toebe,* 315 Pa. 218, 173 A. 169 (1934) (administrator's bond); *Commonwealth, to Use of Haines v. Fidelity & Deposit Co. of Maryland,* 224 Pa. 95, 73 A. 327 (1909) (trustee's bond); *McMicken v. Commonwealth,* 58 Pa. 213 (1868) (constable's bond) *Eagles v. Kern,* 5 Whart. 144, 1840 WL 3930 (1840) (constable's bond).

¶ 28 This proposition is not generally applicable to all sureties, however. Indeed, in the most recent of the above decisions, *Pennsylvania Turnpike Com'n, supra.,* the Court, in finding a surety liable on a turnpike commissioner's bond following the commissioner's criminal conviction for malfeasance, cited only official bond cases whose holdings were clearly limited to such bonds. *See Fidelity & Deposit Co. of Maryland,* 224 Pa. at 102, 73 A. at 329 (*"As to official bonds, bonds of indemnity, and bonds to insure the faithful performance of duty and to secure a proper accounting by persons in fiduciary relations,* the rule of our cases seems to be that a judgment against the principal is conclusive against his sureties as to his misconduct and failure to properly account." (emphasis added)); *Turner,* 340 Pa. at 471, 17 A.2d at 354 (*"where the official bond* is conditioned upon the recovery of judgment against the principal, or upon the declaration of a forfeiture, the

---

**13.** Black's Law Dictionary defines official bond as "[a] bond given by a public officer, conditioned that he shall well and faithfully perform all the duties of the office. The term

is sometimes made to include the bonds of executors, guardians, trustees, etc." Black's Law Dictionary 180 (6th Edition 1990).

rights of the surety will be concluded by the entry of such judgment against him, or by such forfeiture." (emphasis added)).

¶ 29 The sureties on official or fiduciary bonds are liable because, by the nature of the bond relationship, the sureties submit to the acts of the principal and to judgments against the principal. Our Supreme Court explained:

At the outset, it may be remarked that the bond in the case at bar [an attachment bond] is not an official bond, or a bond of indemnity, or a bond to insure the faithful performance of duty, or to secure a proper accounting by persons acting in fiduciary relations, and therefore the rule in this class of cases, that a judgment against the principal is conclusive against his sureties as to his misconduct, and failure to properly account, has no controlling force here. In the class of cases referred to, the surety submits himself to the acts of his principal as a legal consequence of his suretyship because, as the courts have said, it was the intention of the parties to the undertaking to assume this liability. This rule applies to bonds of administrators and guardians, bonds of assignees for benefit of creditors, official bonds, bonds of indemnity, and other bonds of like character.

*Commonwealth, to Use of Gettman v. A.B. Baxter*, 235 Pa. 179, 182–83, 84 A. 136, 137 (1912). Thus, where an official bond is at issue, or a similar bond concerning the faithful performance of an official or fiduciary duty, a judgment against the principal necessarily triggers the liability of the surety given the nature of the bond.

¶ 30 Similarly, where a surety has *explicitly* agreed to be bound by a judgment against the principal, the same result is reached. For example, attachment bonds issued to dissolve an attachment and allow the sale or other disposition of prop-

erty attached by a plaintiff often specifically provide that the plaintiff may look to the surety on the bond for satisfaction of any judgment obtained against the property owner. In such cases, a judgment against the surety is likewise binding on the surety. *See Clauss v. Ainey*, 279 Pa. 534, 124 A. 183 (1924); *Commonwealth, to Use of Gettman v. A.B. Baxter, supra. But see G.H. McShane Co., Inc. v. Travelers Indem. Co.*, 262 Pa.Super. 80, 85–6, 396 A.2d 654, 657 (1978) (surety in foreign attachment action may raise issue of unconstitutionality of foreign attachment law not raised by principal).

¶ 31 Decisions that concern official bonds, administrator's bond, attachment bonds, or the like, where the surety, either explicitly or by the nature of the surety arrangement, has agreed to be bound by a judgment against the principal, do not apply here. Nothing in the surety agreement between Guarantors and First City indicates that Guarantors agreed to be conclusively bound by a confessed judgment against Professional Male.

¶ 32 Moreover, even in bond cases, there is some question whether a surety is bound by a judgment reached by default or confession, where, as here, the surety had no opportunity to defend. *See Turner*, 340 Pa. at 472, 17 A.2d at 354 (noting that there is "some authority" for extending rule to judgments by default or confession, and commenting that "[w]here judgment is entered against the principal by confession or default, upon pleadings which set forth solely acts of official misconduct for which the surety would be liable upon the bond, and *where the surety has failed to avail itself of an opportunity to enter a defense* in the name of the principal, there can be no injustice in giving the judgment the effect of conclusive, or at least prima facie, evidence against the surety" (emphasis added), but declining to reach the issue); *G.H. McShane Co.*

262 Pa.Super. at 86–7, 396 A.2d at 657 (Spaeth, J., concurring) (commenting that in the absence of fraud or collusion, "a consent judgment against the principal may be attacked by the surety if the surety did not participate in the suit against the principal in some cases, but not in cases where the surety is a judgment surety").

¶ 33 Our research has disclosed far fewer cases regarding the binding effect of a judgment on a surety outside the context of a bond arrangement. The extant cases, however, suggest that where the surety had no right to defend, as in the case of a confessed judgment, as here, or potentially in the case of a default judgment, the judgment against the principal is not binding.

¶ 34 Indeed, a Supreme Court case is directly on point. In *Giltinan v. Strong*, 64 Pa. 242, 1870 WL 8689 (1870), the Court held that a judgment recovered against a tenant for rent is not evidence against the surety on the lease where the surety had no opportunity to defend:

> But we think the court erred in holding that the record of the judgment against Maguire [the tenant] was competent evidence against Giltinan [the surety]. If the liability is direct and primary, it is clear this is so, and if the writing is viewed as a mere undertaking of suretyship, still it was error; Giltinan was no party to that action, had no notice to defend it, and could not be brought into defence of it by the plaintiff.

*Id.* at 245, 1870 WL 8689 at *3.

¶ 35 *Giltinan* was cited for support in a later case, *Thommen v. Aldine Trust Co.*, 302 Pa. 409, 153 A. 750 (1931). There, the plaintiff and her husband had jointly started a company. She left the company, and later sued her husband's estate to make payments guaranteed by him in the event the company defaulted on payments due under her noncompete agreement with the company. The Court held that she could not use her prior successful judgment against the company, wherein the estate had no notice or ability to defend, against the estate. *Id.* at 414–16, 153 A. at 752. In so holding, the Court clarified the distinction between official bonds and the situation where a surety had agreed only to pay on the default of another:

> Had the agreement to indemnify been based on an official bond, or constituted a promise to pay a judgment which might be secured against the principal, the first recovery would be held binding on defendant in the second action. . . . A contrary determination is reached where, as here, the surety has not agreed to be bound by a judgment against his principal (*Giltinan v. Strong, supra*), but has contracted to indemnify only in case of default in the payment of a debt by another.

*Id.* at 416, 153 A. at 752.

¶ 36 We find further guidance in the Restatement of Security, to which this Court has turned for support in other contexts.[14] Subsection 3 of Section 139, "Judgments Between Creditor And Principal: Effect As Proof Of Principal's Liability In Action By Creditor Against Surety," states:

---

14. *See, e.g., J.F. Walker Co., Inc. v. Excalibur Oil Group, Inc.*, 792 A.2d 1269, 1274 (Pa.Super.2002) (citing Section 128, "Modification Of Principal's Duty"); *Uhl Const. v. Fidelity & Deposit Co. of Maryland*, 371 Pa.Super. 520, 530, 538 A.2d 562, 567 (1988) (citing Section 142, "Application Of Payments To Creditor"); *First Nat'l Consumer Discount Co. v. McCrossan*, 336 Pa.Super. 541, 550, 486 A.2d 396, 401 (1984) (citing Section 132, "Surrender Or Impairment Of Security By Creditor").

Where, in an action by a creditor against a principal, judgment is obtained by default or confession against the principal, and the creditor subsequently brings an action against the surety, proof of the judgment against the principal is evidence only of the fact of its rendition.

Restatement of Security § 139. The commentary to this section explains:

The probative significance of a judgment obtained by confession or default is much less than that of a judgment after trial on the merits. Moreover, the arguments of policy and convenience against duplication of trials have little weight where there has not been a determination after consideration of evidence introduced by both sides to a litigation. Such a judgment against the principal does not create a rebuttable presumption of the principal's liability, in an action between creditor and surety.

Restatement of Security § 139 cmt. e.

■■■■■ ¶ 37 In accord with these authorities, we hold that, except where the surety agreement concerns an official or other fiduciary bond, or where the agreement explicitly states otherwise, a default or confessed judgment obtained against the principal in the underlying action is not evidence of liability in an action against the surety, unless, in the underlying action, the surety had an opportunity to defend. Applying this rule, the trial court below correctly prohibited the admission of the confessed judgment against Professional Male, an action in which Guarantors had no ability to defend, as evidence of Guar-

antors' liability in the action by First City against them.[15]

¶ 38 For all the foregoing reasons, we reverse the judgment for First City, and remand for further proceedings consistent with this opinion.

¶ 39 Judgment **REVERSED**. Case **REMANDED**. Jurisdiction **RELINQUISHED**.

¶ 40 GRACI, J. files a Concurring and Dissenting Opinion.

## CONCURRING AND DISSENTING OPINION BY GRACI, J.:

¶ 1 I am reluctant to disagree with my learned colleagues in the majority and agree, in large measure, with the result reached by its learned author. However, in my view, the Guarantors were not discharged by the material modification of the lease. Accordingly, I write separately.[16]

¶ 2 I fully agree with the majority's disposition of the first issue on appeal, that the trial court did not err by *sua sponte* granting judgment for First City on the morning of trial, after the jury was selected. However, I disagree with the majority's disposition of the next issue that it addresses, regarding whether Guarantors [17] cease to be liable under a lease when the terms and duration of the lease are changed without their notice.

¶ 3 As the majority indicates, in *Reliance Ins. Co. v. Penn Paving, Inc.*, 557 Pa. 439, 734 A.2d 833 (1999) our Supreme Court stated:

---

**15.** Given that we have vacated the judgment entered against Guarantors, we will not review First City's final argument, that it was entitled to an award of counsel fees under the Guaranty Agreement.

**16.** Because of my different resolution of this issue, I am compelled to address some issues not reached by the majority.

**17.** As the majority notes, although denominated as "guarantors," they are more properly categorized as sureties. *See* Majority Opinion, at 437 n. 7.

Cognizant of the problems posed by the three-party composition of suretyships, Pennsylvania courts have uniformly recognized that where the creditor and the debtor materially modify the terms of their relationship without obtaining the surety's assent thereto, the surety's liability may be affected. A material modification in the creditor-debtor relationship consists of a significant change in the principal debtor's obligation to the creditor that in essence substitutes an agreement substantially different from the original agreement on which the surety accepted liability. Where, without the surety's consent, there has been a material modification in the creditor-debtor relationship, a gratuitous (uncompensated) surety is completely discharged. A compensated surety is discharged only if, without the surety's consent, there has been a material modification in the creditor-debtor relationship and said modification has substantially increased the surety's risk.

*Id.* at 838 (citation omitted). "In determining whether a surety has consented to a material modification, the suretyship 'contract must be given effect according to its own express intention as gathered from all the words and clauses used, taken as a whole, due regard being had also to the surrounding circumstances.'" *Id.* (citation omitted).

¶ 4 The Court found that the surety agreement in that case did not contain an express waiver of a material modification of risk of liability. Consequently, the Court held that the surety should be discharged.

¶ 5 Here, I agree with the majority that Guarantors were compensated sureties since they were officers and owners of Professional Male when making the guarantee and that the amended lease was a material modification of the original lease which substantially increased Guarantors' risk in that it extended the lease term for an additional five years. Moreover, I agree that section (a) of paragraph 2 of the Guaranty Agreement, providing that by signing the Guaranty Agreement, Guarantors agree that "any amendment or modification of the provisions of the Lease Agreement" shall not discharge them, Guaranty Agreement, 10/8/91, at ¶ 2, § a, does not, itself, bind Guarantors since it does not expressly refer to a material modification of risk of liability as required under *Reliance Ins. Co.* However, I cannot agree that section (e) of paragraph 2 of the Guaranty Agreement creates an ambiguity as to whether or not Guarantors consented to material modifications in the lease that increased their risk.

¶ 6 "In construing a contract, the intention of the parties is paramount and the court will adopt an interpretation which under all circumstances ascribes the most reasonable, probable, and natural conduct of the parties, bearing in mind the objects manifestly to be accomplished." *Charles D. Stein Revocable Trust v. General Felt Industries, Inc.*, 749 A.2d 978, 980 (Pa.Super.2000) (citation omitted). "If the language appearing in the written agreement is clear and unambiguous, the parties' intent must be discerned solely from the plain meaning of the words used." *Id.* (citation omitted).

[C]ontractual language is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense. This is not a question to be resolved in vacuum. Rather, contractual terms are ambiguous if they are subject to more than one reasonable interpretation when applied to a particular set of facts. We will not, however, distort the meaning of the language or resort to strained contrivance in order to find an ambiguity.

*J.W.S. Delavau, Inc. v. Eastern America Transport & Warehousing, Inc.,* 810 A.2d 672, 681–82 (Pa.Super.2002) (citation omitted).

¶ 7 In my opinion, there is only one reasonable interpretation of section (e), which provides that by signing the Guaranty Agreement, Guarantors agree that "*any act,* thing, omission or delay to do any act or thing *that may, in any manner,* or to any extent, *vary the risk of Guarantor or that would otherwise operate as a discharge of any Guarantor as a matter of law*" shall not discharge them. Guaranty Agreement, 10/8/91, at ¶ 2, § e (emphasis added). I agree that the amended lease was a material modification of the original lease as it substantially increased Guarantors' risk. Such a material modification substantially varies Guarantors' risk and *would otherwise operate* as a discharge of any Guarantor as a matter of law pursuant to *Reliance Ins. Co.* Section (e) clearly and unambiguously changes this result. Under that section, any act that *would otherwise operate* to discharge the Guarantors as a matter of law (such as a substantial material modification of the lease as here) simply does not have such an effect. The liability of the Guarantors shall not be discharged, under the terms of the agreement, even though as a matter of law, in the absence of such a clause in the agreement, they "otherwise" or "in a different manner" would be discharged. When the clear language of section (e) is read in the context of the whole agreement under this particular set of facts as is required under *Reliance Ins. Co.* and *J.W.S. Delavau, Inc.,* then the only reasonable conclusion is that the Guarantors are not discharged. Accordingly, I would affirm the judgment entered against Guarantors.

¶ 8 Because I would not vacate the judgment entered against Guarantors based on their contention that they cease to be liable since the terms and duration of the lease were changed without their notice, I would also review Guarantors' final argument, that material changes in Professional Male's lease with First City constitute a new and different lease for which the guarantors of the first lease are not liable.

¶ 9 "[O]nce a contract has been formed, its terms may be modified only if both parties agree to the modification and the modification is founded upon valid consideration." *J.W.S. Delavau, Inc.,* 810 A.2d at 681 (citation omitted). "A modification does not displace a prior valid contract; rather, the new contract acts as a substitute for the original contract, but only to the extent that it alters it." *Melat v. Melat,* 411 Pa.Super. 647, 602 A.2d 380, 385 (1992) (citation omitted).

¶ 10 Here, the caption of the modifying document itself clearly and unambiguously indicates that it is a "Lease Amendment and Extension Agreement," not a new and different lease agreement. Lease Amendment and Extension Agreement, 2/15/96. The document, signed by representatives of First City and Professional Male, also clearly and unambiguously states that it is "amending the terms and conditions" of the original agreement, *id.* at 1, that Professional Male and First City agree that the original agreement "shall be, and hereby is, amended and extended," *id.,* and that all other terms, provisions, and conditions of the original agreement "not amended by this Agreement shall remain in full force and are hereby ratified and confirmed by [First City and Professional Male]." *Id.* at 3. Moreover, Professional Male agreed to pay First City "$3,697.83 per month payable in equal monthly installments on the first day of each Calendar Month of the sixth through the eighth Lease Year, inclusive" and "$4,076.02 per month payable in equal monthly installments on the first day of each Calendar

462

Month of the ninth through the tenth Lease Year, inclusive" in exchange for the lease extension. *Id.* at 1–2. Therefore, in my view, both Professional Male and First City agreed to the modification, and the modification was founded upon valid consideration. Accordingly, since the modification was valid and did not displace the prior valid contract, I would affirm the judgment entered against Guarantors.

¶ 11 I fully agree with the majority's disposition of the first and second issues that First City raises in its cross-appeal, that the trial court erred when it *sua sponte*, by order dated October 2, 2000, substituted McIntyre Square in place of First City in the caption and that the trial court correctly prohibited the admission of the confessed judgment against Professional Male as evidence of Guarantor's liability in the action by First City against them. However, since I would affirm the judgment entered against Guarantors, I would also review First City's final argument, that it was entitled to an award of counsel fees under the Guaranty Agreement.

¶ 12 "Although parties to a lawsuit are generally responsible for their own attorney's fees, where one party expressly contracts to pay the other's fees, such an obligation will be enforced." *Putt v. Yates–American Mach. Co.*, 722 A.2d 217, 226 (Pa.Super.1998) (citation omitted). Here, Guarantors expressly contracted to "pay to [First City], on demand, all expenses (*including reasonable expenses for attorney's fees* and reasonable charges of every kind) incidental to, or relating to the enforcement of th[e] Guaranty Agreement." Guaranty Agreement, 10/8/91, at 1, ¶ 1 (emphasis added). Accordingly, in my view, First City is entitled to an award of counsel fees.

¶ 13 For these reasons, I would affirm the lower court at No. 858 WDA 2001,

reverse the Order of October 2, 2000, altering the caption at No. 924 WDA 2001, affirm the order granting Guarantors' motion *in limine*, prohibiting First City from introducing its confessed judgment against Professional Male at No. 924 WDA 2001, and remand the case for a determination of appropriate attorney's fees and charges as due First City under the Guarantee Agreement at No. 924 WDA 2001.