J-A25034-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | |
|---|---|
| J.C. PENNEY CORPORATION, INC., A DELAWARE CORPORATION | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| | No. 238 WDA 2022 |
| GFM 23, LLC, A PENNSYLVANIA LIMITED LIABILITY COMPANY, WILLIAM G. MCCONNELL, IN HIS CAPACITY AS TRUSTEE OF THE WILLIAM G. MCCONNELL FUNDED REVOCABLE TRUST AGREEMENT, DATED FEBRUARY 1, 2000, EUGENIA F. MCCONNELL, IN HER CAPACITY AS TRUSTEE OF THE EUGENIA F. MCCONNELL FUNDED REVOCABLE TRUST AGREEMENT, DATED FEBRUARY 1, 2000, G. THOMAS MCCONNELL AND CHARLENE S. MCCONNELL, HIS WIFE, MARY ELEANOR MILHEIM AND IRVINE G. MILHEIM, HER HUSBAND, MARTHA M. BEEZER AND GENE BEEZER, HER HUSBAND, WILLIAM G. MCCONNELL, JR., AND JENNIFER S. MCCONNELL, HIS WIFE, ANNE M. SHANNON AND MICHAEL R. SHANNON, HER HUSBAND, JOHN C. MCCONNELL AND SHANNON K. MCCONNELL, HIS WIFE, CATHERINE M. METTENBURG AND JOSEPH M. METTENBURG, HER HUSBAND, TERRENCE C. MCCONNELL, CYNTHIA M. ANDREYKO AND GREGORY M. ANDREYKO, HER HUSBAND, CATHLEEN L. HERBERGER AND TIMOTHY F. HERBERGER, HER HUSBAND, MATTHEW B. MCCONNELL AND ANGELA M. MCCONNELL, HIS | |

WIFE, MATTHEW B. MCCONNELL, IN :
HIS CAPACITY AS TRUSTEE OF THE :
MCCONNELL FARMS REVOCABLE :
TRUST, DATED DECEMBER 11, 2017, :
STEPHEN G. MILHEIM, IN HIS :
CAPACITY AS TRUSTEE OF THE :
STEPHEN G. MILHEIM REVOCABLE :
TRUST, DATED JULY 11, 2013, :
WILLIAM G. MILHEIM AND :
JACQUELINE B. MILHEIM, HIS WIFE, :
ANNA MARIE MILHEIM, GEORGE H. :
MILHEIM, MARY MICHELE MILHEIM, :
HANNAH LEE MILHEIM, REBECCA B. :
SMITH, AND WILLIAM D. SMITH, :
HER HUSBAND, DAVID G. BEEZER :
AND SHANNON BEEZER, HIS WIFE, :
JOHANNA ELEANOR GIBSON AND :
JOHN RYAN GIBSON, HER HUSBAND

Appeal from the Order Entered January 28, 2022
In the Court of Common Pleas of Mercer County Civil Division
at No(s):  2019-3655

BEFORE:   KUNSELMAN, J., NICHOLS, J., and McCAFFERY, J.

MEMORANDUM BY McCAFFERY, J.:                **FILED:  June 23, 2023**

In these cross-actions for declaratory judgment, J.C. Penney

Corporation, Inc., a Delaware corporation (Penney), appeals from the order

entered in the Mercer County Court of Common Pleas, declaring there is no

commercial lease currently binding the parties,[1] and thus Penney is a tenant

---

[1] The defendants in the underlying proceedings, who were also the initial appellees in this appeal, were: GFM 23, LLC; multiple members of the McConnell family; and other individuals, some in their individual capacities and some as trustees of trusts.  They co-owned the property at issue in this matter.
*(Footnote Continued Next Page)*

at will.  Penney argues the trial court erred in: (1) interpreting the phrase, "any extension thereof," appearing in the parties' 1967 agreement, to mean only the extensions set forth in Penney's original 1966 sublease, and did not, as Penney argues, include its 2003 amended sublease agreement; and (2) finding the 2003 amended agreement was not an "extension" of the 1966 agreement.  After careful review, we affirm.

## I.  Facts

In reviewing the parties' claims, we must examine four related agreements.  The underlying facts are generally not disputed, although the parties disagree as to the legal effect of some events.  *See* N.T. at 4.  We glean the following history from the parties' well-presented arguments at the November 23, 2021, hearing before the trial court, as well as the court's opinion.

_____

On October 17, 2022, Butterfli Holdings 011 LLC (Butterfli) filed a petition with this Court to intervene and be substituted as appellee.  Butterfli averred it purchased the property at issue on August 5, 2022, and assumed all of the prior owners' rights, title, and interests in the property.  This Court granted the petition to be substituted as appellee on October 20th.  Both the original appellees and Butterfli are represented by the same attorney, William McConnell, Jr., Esquire, who himself is part of the McConnell family that owned the property.  *See* N.T., 11/23/21, at 33.  For ease of discussion, as the factual history involves numerous parties and their successors, the identities of whom are not germane to our legal analysis, we will refer to the original owners of the property and their successors collectively as "Owner."

Beginning in the 1940s, Owner owned land in Hermitage, Mercer County. N.T. at 6. On May 31, 1966, Owner executed a commercial ground lease (1966 Ground Lease) with Crown Construction Company (Crown), as lessor. Crown constructed the Shenango Valley Mall on the property, and then owned the mall. *Id.* at 6, 14. The lease between Owner and Crown had a 35-year term and provided three five-year renewal periods, for a total 50-year term.

On October 27, 1966, Crown entered into a sublease with Penney (1966 Penney Sublease), which had an initial term of 25 years. The sublease provided a "15-year automatic extension" should Penney expand its store, but "that expansion never occurred" and thus this extension was not triggered. N.T. at 7. The sublease further provided Penney the option to extend the sublease by four consecutive five-year periods.[2]

Three months thereafter, on January 23, 1967, Owner, Crown, and Penney executed an "Owner Agreement." Its purpose was to protect Penney's sublease interests in the event of termination of the 1966 Ground Lease. N.T. at 11-12. Owner would stand in the place of Crown and be bound by the terms of Penney's sublease. Trial Ct. Op., 1/28/22, at 3. Pertinently, Paragraph 4(a) set forth the duration of the Owner Agreement:

---

[2] If all of the above extensions were made, the total term of the sublease would have been 60 years — 10 years longer than the maximum possible ground lease between Owner and Crown. N.T. at 9-10.

- 4 -

4. If Penney shall perform the obligations under the Penney Lease[, Owner] covenants and agrees that:

a. Penney shall have and enjoy **during the term of the Penney Lease and any extension thereof**[,] the quiet and undisturbed possession of the premises . . . and Penney's possession and rights under the Penney Lease shall not be adversely affected in any way by reason of default by Crown[,] termination or cancellation of the [G]round [L]ease . . . .

Owner Agreement, recorded 9/18/67, at 1-2 (emphasis added), Exh. 2 to Penney's Complaint in Action for Declaratory Judgment, 11/13/19.

It is the interpretation of the above phrase, "any extension thereof" — not defined in the Owner Agreement —that is the subject matter of the parties' cross-declaratory actions. Owner contends "any extension thereof" unambiguously means only the extensions set forth in the 1966 Penney Sublease — *i.e.*, the automatic 15-year extension if Penney expanded its store, along with the four optional five-year extensions. **See** N.T. at 18.

Penney exercised the entire 25 year-initial term of its 1966 sublease, as well as two of the four optional five-year extensions. Accordingly, the new end date of the sublease became January 31, 2004. Trial Ct. Op. at 3; N.T. at 10. However, prior to this date, on July 7, 2003, Crown and Penney entered into an agreement, entitled "Lease Extension/Modification Agreement" (2003 Penney Sublease). This agreement did not include Owner as a party. The trial court noted the 2003 agreement

substantially altered the terms of the [1966 Penney Sublease] in various ways, including, *inter alia*:

- 5 -

> a. Extend[ing] the "base term" for 5 years.
>
> b. Offering four . . . additional five . . . year extensions[.] If fully exercised, the [2003 Penney Sublease] would have terminated on Jan. 31, 2029 (later than any extension contemplated in the [1966 Penney Sublease]).
>
> C. Alter[ing] terms of "Net Retail Sales" as specified under [the 1966 Penney Sublease, which were used to calculate rent, and]
>
> d. Add[ing] the term "Reserved Tracts," putting substantial limitations on [Crown's] rights to alter the premises.

Trial Ct. Op. at 3-4.

Penney's central argument in this matter is that: (1) the phrase, "any extension thereof," at Paragraph 4(a) of the Owner Agreement, unambiguously means any extension whatsoever, without any limitations; (2) the phrase thus encompasses the 2003 Penney Sublease; and accordingly (3) pursuant to the Owner Agreement, Owner continues to stand in Crown's place and is bound to recognize Penney's sublease rights.[3]  **See** N.T. at 35.  Owner, on the other hand — in addition to its above argument — contends the 2003 Penney Sublease is not in fact an "extension" of the 1966 Penney Sublease because it altered so many material terms, and instead, the 2003 sublease is an amended or even new sublease.  **Id.** at 18, 27.  Finally, Owner avers that when it executed the Owner Agreement in 1967, it contemplated only the

_____

[3] Penney argues it has one remaining option to extend the 2003 Penney Sublease by five years, through 2029.  N.T. at 41.

1966 Penney Sublease, and never consented to being bound by any potential agreement to be made 50 years in the future. *Id.* at 18.

Returning to the factual history of this case, we summarize that Crown's rights under the 1966 Ground Lease were assigned several times. The final assignee defaulted on the Ground Lease in 2017 or 2018.[4] N.T. at 13. Owner initiated an action to terminate the Ground Lease, and by court order of January 18, 2019, it was terminated. As a result, Owner came to own, in addition to the land, the mall and the buildings upon it. *Id.* at 14.

According to Owner, it considered Penney, at that point, to be a holdover tenant and accepted rent from Penney accordingly. N.T. at 30. Penney, on the other hand, contends that when it provided Owner with a copy of the Owner Agreement, Owner did not deny that the Owner Agreement was in effect, nor did it inform Penney of its purported month-to-month or at-will tenant status. *Id.* at 46-47. Instead, Penney claims, Owner merely replied it would "step into the shoes of the landlord on the [Penney] lease," which signfied Owner's understanding that the Owner Agreement and 2003 Penney Sublease remained in effect. *Id.* at 47.

---

[4] The final assignee was Iowa Square Realty. Penney provides the Mercer County Court of Common Pleas trial docket number for this lawsuit as 2018-3258. Penney's Brief at 16.

In any event, on October 23, 2019, Owner notified Penney that, in light of the dissolution of the 1966 Ground Lease between Crown and Owner, Penney was now a tenant at will.

## II. Procedural History

On November 13, 2019, Penney filed a complaint for declaratory judgment. Owner filed an answer, new matter, and counterclaim, likewise seeking declaratory judgment.[5] The trial court heard oral argument on November 23, 2021, portions of which are summarized above.

On January 28, 2022, the court issued the underlying order, declaring: (1) the Owner Agreement phrase, "any extension thereof," unambiguously bound Owner only to the 1966 Penney Sublease; (2) the 2003 Penney Sublease was not an extension of the 1966 sublease, as it made material modifications; and (3) accordingly, Owner's obligations under the Owner

_____

[5] We note that on March 23, 2020, the entire bench of the Mercer County Court of Common Pleas recused from this matter, as it involves a Mercer County commissioner. The Honorable Harry Knafelc, Senior Judge of the Beaver County Court of Common Pleas, was accordingly specially appointed to preside over this matter.

On May 29, 2020, Penney filed a suggestion of bankruptcy and notice of automatic stay. The bankruptcy was discharged 10 months later, and on April 9, 2021, the court ordered the parties to resume this litigation.

Meanwhile, on January 6, 2020, Owner filed a motion for summary judgment, and on September 14, 2021, Penney filed a cross-motion for summary judgment. No rulings on these motions appear in the record or on the trial docket.

Agreement were extinguished by the execution of the 2003 Penney Sublease. Order, 1/28/22, at 15-16. The court thus concluded there was presently no contractual relationship between Owner and Penney and, because Owner continued to accept rent, Penney was a tenant at will. *Id.* at 16.

Penney filed a timely notice of appeal, and in response to the trial court's order, filed a Pa.R.A.P. 1925 statement of errors complained of on appeal.[6]

### III. Statement of Questions Involved

Penney presents six related issues for this Court's review:[7]

1. Does the term "any extension thereof" in Section 4(a) of the Owner Agreement encompass **any** extension of the original [1966 Penney Sublease's] term — including those provided in the 2003 [Penney Sublease] — and not only the four five-year extensions specified in the original [1966 Penney Sublease]?

2. Does [Owner's] express consent to and approval of the original [1966 Penney Sublease], including the provision that the original [1966 Penney Sublease] could be amended by Penney and [Crown] without [Owner's] consent or approval, confirm that Section 4(a) of the Owner Agreement encompasses **any** extension and/or amendment of the original [1966 Penney Sublease], including the 2003 [Penney Sublease]?

3. Does the 2003 [Penney Sublease] constitute an extension and amendment of the original Penney Lease rather than an entirely new lease agreement that extinguished the original [1966 Penney Sublease]?

---

[6] Penney's Rule 1925(b) statement raised 22 enumerated claims. We remind counsel that a prolix statement presenting "an outrageous number of issues" may "circumvent[ ] the meaning and purpose of Rule 1925(b) and . . . thereby effectively preclude[ ] appellate review of the issues[.]" *See Kanter v. Epstein*, 866 A.2d 394, 401 (Pa. Super. 2004).

[7] We have reordered Penney's issues for ease of review.

4. Did the trial court err in considering provisions of agreements outside the Owner Agreement, including an insert to page 18(a) of the [1966 Penney Sublease], to support a narrow interpretation of Section 4(a) of the Owner Agreement?

5. Should [Owner's] conduct in 2019 be considered in determining the proper interpretation of the term "any extension thereof" in Section 4(a) of the Owner Agreement?

6. If the Owner Agreement applies to any extension of the [1966 Penney Sublease] and not just the extensions set forth in the original [1966 Penney Sublease], are the provisions of the [1966 Penney Sublease] as amended by the 2003 [Penney Sublease] enforceable against [Owner] under the Owner Agreement?

Appellant's Brief at 5-7.

## IV. Standard of Review & Relevant Authority

We first consider the relevant standard of review: "The interpretation of any contract is a question of law and this Court's scope of review is plenary. [W]e need not defer to the conclusions of the trial court and are free to draw our own inferences." *Sw. Energy Prod. Co. v. Forest Res., LLC*, 83 A.3d 177, 187 (Pa. Super. 2013) (citation omitted).

This Court has stated:

When interpreting the language of a contract, the intention of the parties is a paramount consideration. "In determining the intent of the parties to a written agreement, the court looks to what they have clearly expressed, for the law does not assume that the language of the contract was chosen carelessly."

When interpreting agreements containing clear and unambiguous terms, we need only examine the writing itself to give effect to the parties' intent. The language of a contract is unambiguous if we can determine its meaning "without any guide other than a knowledge of the simple facts on which, from the nature of the language in general, its meaning depends." "When terms in a

- 10 -

contract are not defined, we must construe the words in accordance with their natural, plain, and ordinary meaning." As the parties have the right to make their own contract, we will not modify the plain meaning of the words under the guise of interpretation or give the language a construction in conflict with the accepted meaning of the language used.

On the contrary, the terms of a contract are ambiguous if the terms are reasonably or fairly susceptible of different constructions and are capable of being understood in more than one sense. Additionally, we will determine that the language is ambiguous if the language is "obscure in meaning through indefiniteness of expression or has a double meaning." Where the language of the contract is ambiguous, the provision is to be construed against the drafter.

*State Farm Fire & Cas. Co. v. PECO*, 54 A.3d 921, 928 (Pa. Super. 2012) (*State Farm*) (citations omitted). "The fact that the parties have different interpretations of a contract does not render the contract ambiguous." *Tuthill v. Tuthill*, 763 A.2d 417, 420 (Pa. Super. 2000) (*en banc*) (citation omitted). "The whole instrument must be taken together in arriving at contractual intent." *Mitch v. XTO Energy, Inc.*, 212 A.3d 1135, 1138 (Pa. Super. 2019).

### V. Plain Meaning of "Any Extension Thereof"

In its first issue, Penney maintains the unambiguous, plain, ordinary, Merriam-Webster dictionary meaning of the word, "any," means "any whatsoever[,] without restriction or limitation." Penney's Brief at 38, 39 (emphasis omitted). Accordingly, the phrase, "**any** extension thereof," within the Owner Agreement, applies to the 2003 Penney Sublease. *Id.* at 40-41 (emphasis added). Penney avers the trial court's limitation on the phrase, "any extension thereof," was "an unjustifiably restrictive reading." *Id.* at 33.

Penney further contends the court's interpretation "undermines a central purpose of the Owner Agreement, leaving Penney with no protection under its lease upon the termination of the Ground Lease" between Crown and Owner. *Id.*

In its second issue, Penney avers the trial court erred in finding Owner cannot be held to the terms of the 2003 Penney Sublease, where it did not participate in the negotiation thereto. Penney's Brief at 45-46. In support, Penney contends the court failed to consider the statement in the Owner Agreement, that Owner "hereby consents to and approves of the [1966 Penney Sublease,]" which in turn stated it could be modified by the parties thereto — Penney and Crown. *Id.* at 12. Penney reads these terms together to mean Owner expressly authorized Penney and Crown to amend the 1966 Penney Sublease without Owner's prior approval. *Id.* at 42-43, *citing* Owner Agreement at ¶ 3. It contends, "If the Owner Agreement meant [Owner] approved of the [1966 Penney Sublease] **only in its original, unmodified form**, it would say so." Penney's Brief at 44-45.

We agree with Penney's initial argument — that the plain meaning of the phrase, "any extension thereof," was not limited to the extensions specifically set forth in the 1966 Penney Sublease.

As stated above, the trial court found the term, "any extension thereof," within Paragraph 4(a) of the Owner Agreement, was unambiguous. Trial Ct. Op. at 6. Observing that a contract "should be a read as a whole" and "must

- 12 -

be interpreted to give effect to all of its provisions[,]" the court considered both subsections of Paragraph 4:

> 4. If Penney shall perform the obligations under the Penney Lease[, Owner] covenants and agrees that:
>
>> a. Penney shall have and enjoy **during the term of the Penney Lease and any extension thereof**, the quiet and undisturbed possession of the premises . . . and Penney's possession and rights under the Penney Lease shall not be adversely affected in any way by reason of default by Crown[,] termination or cancellation of the [G]round [L]ease . . . .
>>
>> b. In the event of the termination or cancellation of the [G]round [L]ease, the possession by Penney of the premises . . . **under** . . . **the Penney Lease** and all rights of Penney **under the Penney Lease** will be fully recognized and protected by [Owner], and [Owner] will assume and perform all the obligations set forth in the Penney Lease on the part of [Crown.]

*See id.* (emphases added); Owner Agreement at 1-2. The court reasoned that when the above references to "the Penney Lease" are read together, it is clear the Owner Agreement only endured through the base term of the 1966 Penney Sublease, its 15 year unexercised extension, and the four optional five-year extensions. Trial Ct. Op. at 7.

While we agree that terms of a "whole instrument must be taken together in arriving at contractual intent," *Mitch*, 212 A.3d at 1138, we disagree with the trial court's rationale — that the phrasing in Paragraph 4(b) lends itself to an interpretation that "any extension thereof" means only the extensions specifically set forth in the 1966 Penney Sublease. Instead, the phrases emphasized by the court — "under the Penney Lease" — merely lack

- 13 -

the additional language, "and any extensions thereof," that is present in Paragraph 4(a). This dissimilarity, alone, does not support this particular finding by the trial court.

Instead, as the phrase, "any extension thereof," is not defined in the Owner Agreement, we agree with Penney that we must construe these "words in accordance with their natural, plain, and ordinary meaning." **See State Farm**, 54 A.3d at 928. We further agree the unambiguous, plain, ordinary meaning of "any" connotes no limitations. **See** Penney's Brief at 35-38 (citing Merriam-Webster and www.dictionary.com definitions of the word "any").

Furthermore, we observe the "1966 Penney Sublease" is not synonymous with its 25-year base term. In other words, the terms of the 1966 Penney Sublease, when read as a whole, provide not only for the initial sublease term, but also the specified extensions. Thus, we interpret the extended phrase in the Owner Agreement, "the term of the Penney Lease **and** any extension thereto," to mean: (1) the 25-year initial term, the store expansion-triggered 15-year extension, and the four optional five-year extensions; **and** (2) any additional extensions properly entered into between Penney and Crown.[8] For the foregoing reasons, we conclude Owner would be

_____

[8] Because we conclude the phrase, "any extension thereof" is unambiguous, we limit our review to the writing itself, and need not reach Penney's additional arguments that the trial court's interpretation undermines the purpose of the Owner Agreement. **See** Penney's Brief at 33. We likewise do not review the
*(Footnote Continued Next Page)*

- 14 -

bound to recognize any properly-entered "extension." We thus now review the trial court's finding that the 2003 Penney Sublease was not, however, an "extension" of the 1966 sublease.

## VI. Effect of the 2003 Penney Sublease

In its third issue, Penney asserts the trial court erred in finding the 2003 Penney Sublease was not an extension, amendment, or modification, to/of the 1966 Penney Sublease, but instead an entirely new lease. Penney's Brief at 64. Penney maintains that parties may always modify a written contract, and here, given the length of time it has continuously operated a store at the mall, "[i]t is not surprising . . . that Penney and Crown amended the Penney Lease at various times[.]" *Id.* at 66. Nevertheless, Penney avers, "[m]ultiple sections of the original Penney Lease remained unchanged by the 2003" agreement, including

> the sections titled: Alterations, Condemnation, Continued Possession by Tenant, Covenant of Title, Authority and Quiet Possession, Damage Clause, Default Clause, Lease Binding on Heirs, Other Tenancies, Premises, Pylon Signs, Repairs, Restrictions Affecting Tenant, Signs, Subletting and Assigning, Subordination, and Use Of Premises.

*Id.* at 66-67 (quotation marks omitted). Penney alleges the trial court also failed to consider Section 17 of the 2003 Penney Sublease, which provided

---

trial court's finding that Owner did not intend to bind itself to future agreements not yet executed by Penney and Crown. *See* Trial Ct. Op. at 9.

that "all of the provisions of the original Penney Lease not amended by the 2003 [lease] remained in full force and effect." *Id.* at 68.  We disagree.

As stated above, the trial court found the 2003 Penney Sublease significantly altered numerous material terms — including the length of the base term, the number of optional extensions, the timing and terms of renewal, and the rent calculation scheme.[9]  Trial Ct. Op. at 11.  Penney does not dispute this rationale, notwithstanding its listing of other terms that remained unchanged.  While Penney correctly points that "parties may always modify a written contract previously entered into," *see Consol. Tile & Slate Co. v. Fox*, 189 A.2d 228, 230 (Pa. 1963), it does not cite, and we have not discovered, authority addressing to what extent modifications of a lease may

---

[9] The trial court also cited *McIntyre Square Assocs. v. Evans*, 827 A.2d 446 (Pa. Super. 2003) (*McIntyre Square*), summarizing only that in that decision, this Court held "a lease term extension created a material risk which could not be imputed [to] a non-signatory third-party regardless of waiver [sic]."  Trial Ct. Op. at 12.  Owner explains *McIntyre Square* addressed a surety agreement, and contends it is applicable to this matter because "[t]he guarantees extended by [Owner] to Penney in the Owner Agreement were akin to that of a surety."  Owner's Brief at 21.

We disagree with this comparison.  The *McIntyre Square* Court explained a surety agreement is an agreement to be liable for the debt of another, where "the creditor may look to the surety for immediate payment upon [a] default, without first attempting to collect the debt from the debtor[.]"  *McIntyre Square*, 827 A.2d at 451 n.7.  Owner's obligations under the Owner Agreement and, potentially, Penney's sublease, had nothing to do with assuming Penney's debts.  Instead, Owner and Penney would have an entirely different relationship — that of landlord and tenant.  Accordingly, *McIntyre Square* is not relevant to this appeal.

be made before the new instrument is no longer in the nature of an "extension," but rather a new instrument that replaces the former.

Nevertheless, we find no error in the trial court's reasoning. Again, Penney does not dispute that the 2003 Penney Sublease altered material terms, including the base length of the lease, the number of optional extensions, the timing and terms of renewal, and the method for calculating rent. *See* Trial Ct. Op. at 11. We emphasize these terms vastly differ from the nature of the extensions set forth in the 1966 Penney Sublease. Under that agreement, Penney would simply extend all of the very same terms for an additional period of time. The 2003 Penney Sublease did not similarly provide the parties would continue to observe the same terms; indeed, the length of the base term was extended. Accordingly, we agree with the trial court that the 2003 Penney Sublease was not an "extension" as contemplated in Paragraph 4(a) of the Owner Agreement. On this basis, we agree with the court the Owner Agreement no longer binds Owner to assume Crown's responsibilities under the 1966 Penney Sublease and to recognize Penney's sublease rights.

## VII.  Penney's Remaining Claims

We may quickly dispose of Penney's remaining arguments, which are as follows. First, the trial court erred in stating the Owner Agreement incorporated the 1966 Penney Lease, and accordingly relying on a paragraph, on Page 18(a) of the 1966 Penney Lease. Penney's Brief at 48-49. We note

the trial court reasoned that the language of this paragraph — which "limit[ed] the Owner Agreement's guarantee to 'optional extensions **thereto**" — supported its finding that "any extension thereof" means only the extensions set forth in the 1966 Penney Sublease. Trial Ct. Op. at 7. On appeal, Penney denies the Owner Agreement "incorporated" the 1966 Penney Subease, and thus the trial court erred in considering any language it. Penney's Brief at 49.

In its final issue, Penney avers the trial court erred in determining that even if the Owner Agreement applied to extensions made outside the 1966 Penney Sublease, only the 1966 lease terms would apply (and not any 2003 sublease terms). Penney's Brief at 69-71. In support, Penney reiterates Owner consented to and approved of the 1966 Penney Sublease, which in turn permitted Penney and Crown to amend the lease without notice to or consent from Owner. Reading these provisions together, Penney concludes, contrary to the trial court's determination, that Owner is bound by the 2003 sublease terms.

In light of our above disposition — that Owner is not bound to honor or recognize Penney's rights under the 1966 Penney Sublease — we conclude Penney's remaining arguments are moot. Accordingly, no relief is due.

## VIII. Conclusion

In sum, we do not disturb the trial court's conclusions that: (1) there presently exists no contractual relationship between Penney and Owner; and

thus (2) Penney is a tenant at will.  We affirm the order disposing of the parties' cross-declaratory actions.

Order affirmed.

Judge Nichols joins this Memorandum.

Judge Kunselman files a Dissenting Memorandum.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date:  6/23/2023