J-A08018-24
J-A08019-24
J-A08020-24

2024 PA Super 169

| | | |
|---|---|---|
| SUNOCO (R&M), LLC AND SUNOCO, LLC | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| Appellants | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | No. 1403 EDA 2023 |
| PENNSYLVANIA NATIONAL MUTUAL CASUALTY INSURANCE COMPANY AND GREYHOUND ARAMINGO PETROLEUM COMPANY, INC. AND SERGEY GORLOV | : | |

Appeal from the Order Entered April 27, 2023
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s): 200600271

| | | |
|---|---|---|
| SUNOCO (R&M) LLC, AND SUNOCO, LLC | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| PENNSYLVANIA NATIONAL MUTUAL CASUALTY INSURANCE COMPANY, GREYHOUND ARAMINGO PETROLEUM CO., INC. AND SERGEY GORLOV | : | No. 1532 EDA 2023 |
| | : | |
| | : | |
| APPEAL OF: GREYHOUND ARAMINGO PETROLEUM CO., INC. | : | |

Appeal from the Order Entered April 27, 2023
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s): 200600271

J-A08018-24
J-A08019-24
J-A08020-24

| | | |
|---|---|---|
| SUNOCO (R&M), LLC AND SUNOCO, LLC | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| Appellants | : | |
| | : | |
| v. | : | |
| | : | |
| | : | No. 1404 EDA 2023 |
| PENNSYLVANIA NATIONAL MUTUAL CASUALTY INSURANCE COMPANY AND GREYHOUND ARAMINGO PETROLEUM COMPANY, INC. AND SERGEY GORLOV | : | |

Appeal from the Order Entered April 27, 2023
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s): 200600271

BEFORE: BOWES, J., OLSON, J., and McLAUGHLIN, J.

OPINION BY OLSON, J.: **FILED AUGUST 7, 2024**

In these consolidated matters,[1] Sunoco (R&M), LLC and Sunoco LLC (collectively, "Sunoco") and Greyhound Aramingo Petroleum Company, Inc. ("Greyhound"), on cross-appeal, challenge certain aspects of an order entered in the Court of Common Pleas of Philadelphia County on April 27, 2023, which resolved competing motions for summary judgment. At Superior Court docket 1403 EDA 2023, Sunoco challenges that portion of the April 27, 2023 order that denied its motion for summary judgment, dismissed its claims, and

---

[1] For ease of disposition, we consolidate *sua sponte* the appeals filed with this Court at 1403 EDA 2023 and 1404 EDA 2023, as well as the cross-appeal filed with this Court at 1532 EDA 2023.

- 2 -

granted summary judgment in favor of Sergey Gorlov ("Gorlov"). At Superior Court docket 1404 EDA 2023, Sunoco appeals that aspect of the April 27, 2023 order that denied its motion for summary judgment, dismissed its claims, and granted summary judgment in favor of Pennsylvania National Mutual Casualty Insurance Company ("Penn National"). Lastly, at Superior Court cross-appeal docket 1532 EDA 2023, Greyhound objects to the portion of the April 27, 2023 order that granted Sunoco's motion for summary judgment and awarded indemnity to Sunoco, while denying Greyhound's motion for summary judgment that urged the trial court to dismiss Sunoco's claims. We affirm the April 27, 2023 order, in part, and reverse, in part. The case is remanded for further proceedings in accordance with this opinion

The trial court summarized the factual and procedural history as follows:

This matter stems from an underlying [personal injury cause of] action that resolved in 2019 *via* a settlement agreement.[2] In 2019, [Sunoco] entered into a settlement agreement [to] resolve certain personal injury claims arising out of a motor vehicle accident that occurred on September 25, 2014, at a Sunoco-branded gas station (the "Aramingo Station") located in the City of Philadelphia[, Pennsylvania]. Sunoco supplies branded motor fuel to franchised gas stations across the [United States] in exchange for the ability to use the "Sunoco" name and other considerations. [Greyhound], owned by [Gorlov,] entered into a dealer franchise agreement in October 2013[,] with Sunoco where Sunoco [agreed to] supply the [Aramingo Station] with [Sunoco-]branded motor fuel. [To become] a Sunoco franchisee under the Franchise Agreement, Greyhound agreed to an

_____

[2] The settlement agreement was designated confidential. Therefore, the exact terms of the agreement are not part of the record in the case *sub judice*.

- 3 -

indemnification provision. Section 3.14.1. of the Franchise Agreement provided that:

Greyhound shall fully protect, defend, reimburse, indemnify, and save harmless Sunoco, its parent, its subsidiaries, affiliates[,] and all of their employees from and against any and all claims, liabilities, losses, damages, demands, fines, [and] causes of action of every kind and character from any cause whatsoever, including injury to person and property (including death) of Greyhound, Greyhound's employees, agents, contractors, customers, invitees[,] and other persons caused by or resulting in any way from:

(1) Operation of [Greyhound's] business, including but not limited to operation, condition[,] and use of the Aramingo Station . . .

(2) Performance or non-performance of [Greyhound's] obligations under this [Franchise] Agreement

(3) Operation, use, condition, or state of repair of . . . motor fuel dispensing equipment and

(4) Loss, discharge[,] or spill of petroleum products on or from the [Aramingo Station] . . .

Moreover, in regard to the Greyhound [Franchise] Agreement, Gorlov executed a personal guarantee that states,

In order to induce Sunoco to extend additional credit to Greyhound concerning the purchase of products and services from Sunoco, the undersigned [(Gorlov)] hereby guarantees, jointly and severally, the full and prompt payment [to Sunoco] of any indebtedness and any other monetary liabilities and obligations of Greyhound to Sunoco in connection [therewith], together with all expenses of obtaining payment thereof or enforcing any collateral securities or this [Personal] Guarantee, including court costs and reasonable [attorneys'] fees.

[Penn National] sold SG II [Group, LLC ("SG II")] primary and umbrella liability policies[.[3]]   The [Penn National] primary [insurance] policy provides liability insurance coverage, covering the costs incurred in defense, settlement, or as a result of judgment related to claims brought against SG II or any other insured entities up to the policy limits of [$1,000,000.00] per occurrence and [$1,000,000.00] in the aggregate.  The Grantor of Franchise Endorsement provides as follows:

> The following is added to Paragraph C.  Who Is An Insured in Section II - Liability: The person or organization shown in the Schedule is also an insured, but only with respect to their liability as grantor of a franchise to you.

In the instant action, Sunoco [pursued] indemnification from Greyhound, Penn National, and Gorlov for the amount [] Sunoco [paid to settle] the 2019 underlying [personal injury cause of] action.  Each entity filed a motion for summary judgment in this matter, as all parties agreed that the facts were undisputed and the only issues that remained were questions of law.  On April 27, 2023, [the trial] court entered an order that resolved all six [] motions for summary judgment.  The April 27, 2023 order granted Sunoco's motion for summary judgment against Greyhound.  The order also denied Sunoco's motion for summary judgment against Gorlov and Sunoco's motion for summary judgment against Penn National.  Further, [the trial] court[, in that same order,] granted [Gorlov's] motion for summary judgment and Penn National's motion for summary judgment.

---

[3] We glean from the record that SG II provided administrative services to multiple, separate legal entities, such as Greyhound, that were owned, in part, by Gorlov and operated Sunoco-branded convenience store and gasoline stations throughout Pennsylvania.  These administrative services included providing human resource, accounting, and payroll services, procuring insurance coverage, and arranging maintenance and environmental testing at the convenience stores and gasoline stations.

Trial Court Opinion, 11/3/23, at 1-3 (original brackets, original footnotes, and extraneous capitalization omitted). These appeals and cross-appeal followed.[4]

In the appeal docketed with this Court at 1403 EDA 2023, Sunoco raises the following issues for our review:

1. Whether the trial court erred in finding that the Guarantee Agreement's terms "in connection" with the "purchase of products and services" did not encompass liability for the [underlying personal injury cause of action] where the [underlying personal injury cause of action] arose from the use of Sunoco's products and services at the Aramingo Station[?]

2. Whether the trial court erred in finding that the terms "any indebtedness and any other liabilities and obligations of Greyhound to Sunoco" did not encompass liability for the [underlying personal injury cause of action?]

Sunoco Brief (1403 EDA 2023) at 6 (original brackets omitted).

In the appeal docketed with this Court at 1404 EDA 2023, Sunoco raises the following issues for our review:

1. Whether the trial court erred in finding that Penn National did not have a duty to defend Sunoco under the [insurance] policy's Grantor of Franchise Endorsement, where the underlying [personal injury cause of action] alleged that named insured SG II operated as a franchise of Sunoco and where Sunoco was liable as a consequence of those alleged operations[?]

2. Whether trial court erred in finding that Penn National did not have a duty to insure Sunoco under the Grantor of Franchise Endorsement where undisputed evidence in the

_____

[4] Sunoco, Greyhound (in its cross-appeal), and the trial court complied with Pennsylvania Rule of Appellate Procedure 1925.

- 6 -

> record established SG II acted as a franchisee at the Aramingo Station[?]

Sunoco Brief (1404 EDA 2023) at 7.

In the cross-appeal docketed with this Court at 1532 EDA 2023, Greyhound raises the following issue for our review:

> Whether the trial court erred in granting Sunoco's motion for summary judgment and denying Greyhound's motion for summary judgment[?]

Greyhound Brief (1532 EDA 2023) at 4.

*In toto*, the issues raised on appeal and cross-appeal challenge the trial court's resolution of the parties' competing summary judgment motions. The principles that govern our review of an order granting, or denying, summary judgment are well-settled.

> In evaluating the trial court's decision to enter summary judgment, we focus on the legal standard articulated in the summary judgment rule. [**See**] Pa.R.C[iv].P. 1035.2. [Rule 1035.2] states that where there is no genuine issue of material fact and the moving party is entitled to relief as a matter of law, summary judgment may be entered.

***Murphy v. Duquesne Univ. of The Holy Ghost***, 777 A.2d 418, 429 (Pa. 2001) (case citations, ellipses, and quotation marks omitted); ***see also Swords v. Harleysville Ins. Co.***, 883 A.2d 562, 566 (Pa. 2005) (stating, "a [trial] court shall enter judgment whenever there is no genuine issue of any material fact as to a necessary element of the cause of action or defense that could be established by additional discovery" (citation omitted)).

> A motion for summary judgment is based on an evidentiary record that entitles the moving party to a judgment as a matter of law. In considering the merits of a motion for summary judgment, a court views the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. Finally, the [trial] court may grant summary judgment only when the right to such a judgment is clear and free from doubt. An appellate court may reverse the granting of a motion for summary judgment if there has been an error of law or an abuse of discretion.

*Swords*, 883 A.2d at 566-567 (citations omitted). "When reviewing whether there are genuine issues of material fact, this Court's standard of review is *de novo*; we need not defer to determinations made by [trial] courts; and our scope of review is plenary." *State Farm Fire & Cas. Co. v. Peco*, 54 A.3d 921, 925 (Pa. Super. 2012), *citing* *Gleason v. Borough of Moosic*, 15 A.3d 479, 484 (Pa. 2011).

### 1403 EDA 2023

In the appeal filed with this Court at 1403 EDA 2023, Sunoco asserts that "the Guarantee Agreement requires [Gorlov] to personally guarantee the debts of Greyhound" and the language of the Guarantee Agreement should be interpreted broadly to include indemnification for a third-party litigation settlement. Sunoco Brief (1403 EDA 2023) at 15-30. Sunoco asserts that "the purpose of the Guarantee Agreement is to have [Gorlov] guarantee any liabilities or indebtedness Greyhound owes Sunoco as a result of its business relationship with Greyhound pursuant to the Franchise Agreement." *Id.* at 25. Sunoco contends the trial court erred in narrowly interpreting the terms

"in connection with" and "products and services" in "contravention of the plain language of the Guarantee Agreement."[5]  *Id.* at 16-17, 20.  Sunoco argues that "[h]ad the parties intended to limit the scope of [Gorlov's] indemnification obligation to reimbursement of invoices for products purchased, as the trial court seems to have understood the Guarantee Agreement, the parties would have said as much" in the Guarantee Agreement.  *Id.* at 18-19.  Sunoco avers that, instead, "the Guarantee Agreement's use of the phrase 'in connection with' should be understood to encompass not just [the] extension of [purchasing] credit provided by Sunoco but also the other terms and liabilities incurred by Greyhound in connection with the products and services that formed the business relationship between Greyhound and Sunoco[.]"  *Id.* at 22.  Sunoco contends that the term "products and services" refers to the motor fuel Sunoco provided to Greyhound pursuant to the Franchise Agreement and that the harm suffered by the third-party in the underlying personal injury cause of action was "in connection with" or the "result of" Sunoco providing its "products and services" to Greyhound.  *Id.* at 17 (stating, "had Sunoco not provided 'products and services' to [Greyhound], Sunoco would have faced no liability in connection with the [third-party litigation] and

_____

[5] We note that in its appellate brief, counsel for Sunoco repeatedly refers to the Guarantee Agreement as containing the phrase "in connection with."  *See* Sunoco Brief (1403 EDA 2023) at 20-22, 24, 26.  A review of the Guarantee Agreement reveals that the phrase contained therein is actually "in connection therewith."  *See* Guarantee Agreement, 10/9/23.

Greyhound (and in turn, Gorlov) would be under no obligation to reimburse Sunoco"); *see also id.* at 25-27. Because the third-party's "injuries and subsequent [law]suit were clearly in connection with the products and services referenced in the Guarantee Agreement[,]" Sunoco asserts that Gorlov is obligated, as a matter of law, to reimburse Sunoco, as a guarantee for Greyhound's debt. *Id.* at 26. Sunoco further contends that the Guarantee Agreement's phrase "any indebtedness and any other liability" must be interpreted broadly to encompass the settlement paid by Sunoco in the underlying personal injury cause of action. *Id.* at 27-28. As such, Sunoco maintains that the trial court erred in granting summary judgment in favor of Gorlov and, instead, should have granted summary judgment in favor of Sunoco and against Gorlov. *Id.* at 30.

The Guarantee Agreement executed by Gorlov on October 9, 2013, in favor of Sunoco, states, in pertinent part, as follows:

> In order to induce [Sunoco] to extend additional credit to [Greyhound], concerning the purchase of products and services from [Sunoco, Gorlov] hereby guarantee[s], jointly and severally, the full and prompt payment to [Sunoco] of any indebtedness and any other monetary liabilities and obligations of [Greyhound] to [Sunoco] **in connection therewith**, together with all expenses of obtaining payment thereof or enforcing any collateral security or this Guarantee [Agreement], including court costs and reasonable [attorneys'] fees (said indebtedness, liabilities, obligations[,] and expenses being referred to herein as "Such Obligations").

Guarantee Agreement, 10/9/13, at 1 (emphasis added). Although the October 2013 instrument entered into by Gorlov, and in favor of Sunoco, was captioned

- 10 -

as a "Guarantee Agreement," the instrument is a surety agreement.[6] ***See id.*** at 2 (stating, "[a]lthough referred to as a Guarantee [Agreement], this instrument is intended to be a contract of suretyship upon which [Gorlov] intends to be legally bound"); ***see also*** 8 P.S. § 1 (stating, "Every written agreement hereafter made by one person to answer for the default of another shall subject such person to the liabilities of suretyship, and shall confer upon him[, or her,] the rights incident thereto, unless such agreement shall contain in substance the words: 'This is not intended to be a contract of suretyship,' or unless each portion of such agreement intended to modify the rights and liabilities of suretyship shall contain in substance the words: 'This portion of the agreement is not intended to impose the liability of suretyship.'").

"[A] suretyship arrangement arises when a creditor refuses to extend credit to a debtor unless a third party (the surety) agrees to provide additional security for repayment of the debt by undertaking the debtor's obligation to the creditor if the debtor fails to perform." ***Continental Bank v. Axler***, 510 A.2d 726, 729 (Pa. Super. 1986) (stating, "[i]n general terms, a suretyship represents a three-party association wherein a creditor is entitled to performance of a contractual duty by the principal debtor or alternatively, if

---

[6] "[B]oth guaranty and surety agreements are agreements to be liable for the debt of another[.  T]he principal difference is that the creditor may look to the surety for immediate payment upon the debtor's default, without first attempting to collect the debt from the debtor, whereas the creditor must first seek payment from the debtor before going after a guarantor." ***McIntyre Square Assoc. v. Evans***, 827 A.2d 446, 451 n.7 (Pa. Super. 2003).

- 11 -

the debtor defaults, by the debtor's surety"). In simplest terms, "a surety agreement is a contract[.]" ***Beckwith Machinery Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh***, 890 A.2d 403, 406 (Pa. Super. 2005); ***see also Continental Bank***, 510 A.2d at 729 (stating, "[t]he existence of the suretyship is evidenced by a contract").

The rules for interpreting the meaning of a contract are well-established.

> The fundamental rule in interpreting the meaning of a contract is to ascertain and give effect to the intent of the contracting parties. The intent of the parties to a written agreement is to be regarded as being embodied in the writing itself. The whole instrument must be taken together in arriving at contractual intent. Courts do not assume that a contract's language was chosen carelessly, nor do they assume that the parties were ignorant of the meaning of the language they employed. When a writing is clear and unequivocal, its meaning must be determined by its contents alone.
>
> Only where a contract's language is ambiguous may extrinsic or parol evidence be considered to determine the intent of the parties. A contract contains an ambiguity if it is reasonably susceptible of different constructions and capable of being understood in more than one sense. This question, however, is not resolved in a vacuum. Instead, contractual terms are ambiguous if they are subject to more than one reasonable interpretation when applied to a particular set of facts. In the absence of an ambiguity, the plain meaning of the agreement will be enforced. The meaning of an unambiguous written instrument presents a question of law for resolution by the court.

***Murphy***, 777 A.2d at 429 (citations and quotation marks omitted).

In granting summary judgment in favor of Gorlov and against Sunoco, the trial court explained,

> In the present matter, the plain language of the Guarantee Agreement demonstrates Gorlov's responsibility is limited to only

those liabilities "in connection" with the "purchase of products and services." . . .

The underlying action in this matter involved a car accident at [Greyhound's Aramingo Station]. Thus, the claims for indemnification based upon suits seeking damages for bodily injury arising out of an accident are inherently not concerning the purchase of products and services. Under the relevant jurisprudence[,] as well as the complete record in this matter, [the trial court concludes that Sunoco's complaint does not seek payment from Gorlov for an indebtedness or obligation originally incurred by Greyhound that arose out of] the purchase of [Sunoco's] products and services[,] and Gorlov was not required to extend any additional payment to Sunoco.

Trial Court Opinion, 11/3/23, at 9.

Upon review, we concur with the trial court. The record supports the conclusion that a genuine issue of material fact does not exist as to Gorlov's obligation to indemnify Sunoco; thus, Gorlov was entitled to summary judgment as a matter of law. Pursuant to the Franchise Agreement, Sunoco agreed to provide certain Sunoco-branded products and services to Greyhound in exchange for Greyhound's promise to resell Sunoco's branded products and services at its Aramingo Station. **See** Franchise Agreement, 10/1/13, at Part I – Summary Provisions (Opening Paragraph). Sunoco's products and services included "branded motor fuels under trademark, trade names[,] and trade dress" (**see id.**), as well as, *inter alia*, a credit and debit card program (**see id.** at § 1.04).[7] To facilitate sales of branded products and

---

[7] Sunoco also offered its franchisees, *inter alia*, an on-call maintenance program, which Greyhound did not participate in, or agree to, as part of its Franchise Agreement with Sunoco.

- 13 -

services to Greyhound, Sunoco extended Greyhound credit (***see id.*** at § 3.03 (Terms of Payment); ***see also id.*** at § 4.01 (Financial Obligations)) conditioned upon Greyhound "depositing money or furnishing an irrevocable Letter of Credit" with Sunoco (***see id***. at § 4.02 (Payment of Indebtedness)). Thus, Sunoco extended credit to Greyhound in exchange for monetary deposits or the issuance of irrevocable letters of credit.

As part of the Franchise Agreement, Gorlov provided a personal guarantee (suretyship agreement) in order to "induce" Sunoco to provide "additional credit" to Greyhound.  **See** Guarantee Agreement, 10/9/13, at 1 (stating, "In order to **induce** [Sunoco] to extend **additional credit** to [Greyhound], concerning the purchase of products and services from [Sunoco]" (emphasis added)); ***see also*** Franchise Agreement, 10/1/13, at § 2.05 (Additional Documents Required) (requiring Gorlov to provide a personal guarantee to protect Sunoco's reimbursement rights pertaining to "cash consideration" (as discussed *infra*)).  The "additional credit" extended by Sunoco arose from Section 2.02 of the Franchise Agreement whereby Sunoco agreed to provide Greyhound, *inter alia*, "cash consideration" (*i.e.*, a case advance) to cover the expense of installing Sunoco-branded new image components.  **See** Franchise Agreement, 10/1/13, at § 2.02 (Upfront Consideration).  Section 2.03 of the Franchise Agreement set forth an amortization schedule related to the cash consideration and stated that, if the Franchise Agreement was "terminated or non-renewed, for any reason

- 14 -

whatsoever, by either party prior to [Greyhound's] purchase of the Total Contractual Volume (referring to the total volume of Sunoco-branded motor fuel Greyhound agreed to purchase over the life of the Franchise Agreement)," Greyhound was required to reimburse Sunoco for the unamortized portion of the cash consideration. *Id.* at § 2.03. As stated *supra*, Section 2.05 of the Franchise Agreement required Gorlov to provide a personal guarantee in order to protect Sunoco's reimbursement rights against Greyhound under Section 2.03. *Id.* at § 2.05. Thus, the intent of the Personal Guarantee was to protect Sunoco's reimbursement rights to the unamortized portion of the cash consideration (*i.e.*, the "additional credit") in the event the Franchise Agreement was terminated or was not renewed. In other words, if the cash consideration were not fully amortized prior to the termination or non-renewal of the Franchise Agreement Sunoco had with Greyhound, Sunoco retained the right to collect the portion of the unamortized cash contribution from Greyhound **or** Gorlov.

In so providing the Personal Guarantee, Gorlov agreed to "guarantee, jointly and severally, the full and prompt payment to [Sunoco] of any indebtedness and other monetary liabilities and obligations of [Greyhound] to [Sunoco] **in connection therewith**[.]" Guarantee Agreement, 10/9/13, at 1 (emphasis added). In examining the phrase "in connection therewith," the *Cambridge Dictionary* defines the term "therewith" as "with that; with something that has been previously mentioned[.]" ***See***

- 15 -

https://dictionary.cambridge.org/us/dictionary/english/therewith (last visited June 25, 2024). Therefore, in understanding which indebtedness of Greyhound Gorlov personally guaranteed, the use of the phrase "in connection therewith" refers back to the previously mentioned indebtedness created from Sunoco's extension of "additional credit" (*i.e.* the unamortized portion of the cash consideration in the event of a termination or non-renewal of the Franchise Agreement). Consequently, the plain language of the Guarantee Agreement limits Gorlov's suretyship obligations such that his suretyship obligations do not include indemnification for third-party claims, such as the underlying personal injury cause of action.

As such, we concur with the trial court, and the record supports, that Gorlov was entitled to summary judgment as a matter of law. Therefore, we discern no error of law or abuse of discretion in the portion of the trial court's order granting summary judgment in favor of Gorlov and against Sunoco and, in turn, denying summary judgment in favor of Sunoco and against Gorlov.

## 1404 EDA 2023

In the appeal filed with this Court at 1404 EDA 2023, Sunoco challenges the portion of the trial court's April 27, 2023 order that granted summary judgment in favor of Penn National and dismissed Sunoco's claims against Penn National seeking indemnity and recovery of defense costs incurred in responding to the underlying personal injury actions. Sunoco asserts that it is an "additional insured" under SG II's insurance policy with Penn National

- 16 -

because of the status Sunoco held as a "grantor of a franchise" to SG II, a named-defendant in the underlying personal injury cause of action. Sunoco Brief (1404 EDA 2023) at 21. Sunoco insists that SG II must be treated, for insurance coverage purposes, as a franchisee of the Aramingo Station because the complaint filed in the underlying personal injury case asserted that SG II operated the Aramingo Station like a franchisee. *Id.* at 22-28. To support the contention that the allegations in the underlying personal injury cause of action are dispositive of Sunoco's coverage claim because of the putative franchisor-franchisee relationship Sunoco allegedly maintained with SG II, Sunoco emphasizes that SG II's Penn National policy, and in particular the Grantor of Franchise Endorsement, is silent on how a franchisee-franchisor relationship is established for purpose of triggering insurance coverage. *Id.* at 24-25. In particular, Sunoco asserts that

> Neither the Grantor of Franchise Endorsement, nor any other language in the [Penn National policy], requires the existence of a written franchise agreement [to establish a franchisor-franchisee relationship] or otherwise explains how Sunoco would become the "grantor of franchise" such that coverage would be triggered under the [Grantor of Franchise Endorsement].

*Id.* at 24. Sunoco argues that the complaint in the underlying personal injury cause of action asserted a claim for negligence against "Greyhound" based upon its ownership of, and operation of, the Aramingo Station and that the complaint defined the defendant-party "Greyhound" collectively to include, *inter alia*, SG II. *Id.* Therefore, based upon the allegations in the underlying

- 17 -

complaint, Sunoco maintains SG II was an "owner/operator" of the Aramingo Station and, as such, was a "franchisee" of the Sunoco-branded station. ***Id.*** at 25. Because SG II was a "franchisee" of the Aramingo Station, according to Sunoco, coverage under the terms of the Penn National policy extended to Sunoco as a "grantor of a franchise," and Penn National, therefore, maintained duties to defend and to indemnify Sunoco. ***Id.*** at 25-28.

In addition to its position that the allegations of the underlying complaint established a franchisee-franchisor relationship between Sunoco and SG II, Sunoco asserts that, based upon "the undisputed testimony of SG II's controller," SG II was a "*de facto* franchisee" of the Aramingo Station. ***Id.*** at 28-30. Sunoco argues that SG II's actions of providing, *inter alia*, administrative services in procuring insurance policies and handling all maintenance requests on behalf of Greyhound resulted in "*de facto* franchisee" status being conferred upon SG II. ***Id.***

The interpretation of an insurance policy raises a question of law for which our scope of review is *de novo*. ***Kvaerner Metals v. Com. Union Ins.***, 908 A.2d 888, 897 (Pa. 2006). It is well-established that

> Insurance policies are contracts, and the rules of contract interpretation provide that the mutual intention of the parties at the time they formed the contract governs its interpretation. Such intent is to be inferred from the written provisions of the contract. If doubt or ambiguity exists it should be resolved in [the] insured's favor.

*Am. and Foreign Ins. Co. v. Jerry's Sport Ctr., Inc.*, 2 A.3d 526, 540 (Pa. 2010) (citations omitted), *relying on Standard Venetian Blind Co. v. Am. Empire Ins. Co.*, 469 A.2d 563, 566 (Pa. 1983); *see also Nationwide Mut. Ins. Co. v. Nixon*, 682 A.2d 1310, 1313 (Pa. Super. 1996) (stating, "the proper construction of a policy of insurance is a matter of law which may properly be resolved by a court pursuant to a motion for summary judgment"), *appeal denied*, 693 A.2d 589 (Pa. 1997); *Donegal Mut. Ins. Co. v. Baumhammers*, 938 A.2d 286, 290 (Pa. 2007) (stating, "the interpretation of an insurance contract regarding the existence or non-existence of coverage is generally performed by the court" (brackets and original quotation marks omitted)).

A "duty to defend is separate from and broader than the duty to indemnify" and, therefore, each duty is distinct from the other. *Jerry's Sport Ctr.*, 2 A.3d at 540-541, 543-544; *see also Erie Ins. Exch. v. Moore*, 228 A.3d 258, 267 (Pa. 2020). "The law is clear that when an insured who has been sued requests coverage under a policy of insurance, the insurer is required to accept all of the allegations contained in the third party's complaint as true and provide a defense if there is a chance that the alleged injury could potentially fall within the scope of the policy." *Selective Way Ins. Co. v. Hosp. Grp. Servs. Inc.*, 119 A.3d 1035, 1046 (Pa. Super. 2015); *see also Jerry's Sport Ctr.*, 2 A.3d at 541 (stating, "[a]s long as the complaint 'might or might not' fall within the policy's coverage, the insurance company is

obliged to defend"); *Moore*, 228 A.3d at 268 (stating, "[t]he truth of the complaint's allegations is not at issue when determining whether there is a duty to defend"). "The question of whether a claim against an insured is potentially covered is answered by comparing the four corners of the insurance contract to the four corners of the complaint." *Jerry's Sport Ctr.*, 2 A.3d at 541; *see also Kvaerner Metals*, 908 A.2d at 896-897 (instructing courts to look at policy language to determine the scope of coverage and then examine the underlying complaint to determine whether the allegations constitute the type of instances that trigger coverage).

It is the insurer's responsibility to compare the allegations contained in the underlying complaint to the terms of the policy to determine the insurer's obligations. *Jerry's Sport Ctr.*, 2 A.3d at 541-542. "It is not the actual details of the injury [as alleged in the underlying claim], but the **nature of the claim** which determines whether the insurer is required to defend." *Nationwide Mut. Ins. Co. v. Arnold*, 214 A.3d 688, 695 (Pa. Super. 2019) (emphasis added). "An insurer may not justifiably refuse to defend a claim against its insured unless it is clear from an examination of the allegations in the complaint and the language of the policy that the claim does not potentially come within the coverage of the policy." *Jerry's Sport Ctr.*, 2 A.3d at 541; *see also Arnold*, 214 A.3d at 695. "[T]he duty to defend is not limited to meritorious actions; it even extends to actions that are groundless, false, or fraudulent as long as there exists the possibility that the allegations

implicate coverage." *Jerry's Sport Ctr.*, 2 A.3d at 541 (citation and original quotation marks omitted). "An insurer who refuses to defend its insured from the outset does so at its peril, because the duty to defend remains with the insurer until it is clear the claim has been narrowed to one beyond the terms of the policy." *Arnold*, 214 A.3d at 695 (citation omitted); *see also Jerry's Sport Ctr.*, 2 A.3d at 543 (stating, "[t]he broad duty to defend . . . encourages insurance companies to construe their insurance contract[s] broadly and to defend all actions where there is any potential coverage"); *Moore*, 228 A.3d at 265 (stating, "to the extent there are undetermined facts that might impact on coverage, the insurer has a duty to defend until the claim is narrowed to one patently outside the policy coverage, for example through discovery" (citation and original quotation marks omitted)).

"Like the duty to defend, an insurance company's duty to indemnify an insured in a third party's action flows from a determination that the complaint triggers coverage." *Hosp. Grp. Servs.*, 119 A.3d at 1046 (citation, original quotation marks and brackets omitted); *see also Gen. Accident Ins. Co. v. Allen*, 692 A.2d 1089, 1095 (Pa. 1997) (stating, "[a]lthough the duty to defend is separate from and broader than the duty to indemnify, both duties flow from a determination that the complaint triggers coverage"). "[A] determination of the duty to indemnify, however, is not necessarily limited to the factual allegations of the underlying complaint[ but, rather], there must be a determination that the insurer's policy **actually** covers a claimed

- 21 -

incident." ***State Farm Fire and Cas. Co. v. DeCoster***, 67 A.3d 40, 46 (Pa. Super. 2013) (citation and original quotation marks omitted; emphasis in original). Thus, "[t]he substantive duty of an insurance company to indemnify its insured in a third party's action, however, arises only when the insured is determined to be liable for damages within the coverage of the policy." ***Hosp. Grp. Servs.***, 119 A.3d at 1046 (citation and original quotation marks omitted). Stated another way, if a third party proves its entitlement to damages in a cause of action against an insured and the damage recovery triggers the insurer's duty to indemnify under the terms of the insurance contract, then the insurer is required to indemnify the insured for the damage award.

With these principles in mind, we now turn to the case *sub judice*. In granting summary judgment in favor of Penn National and against Sunoco, the trial court explained,

> In the present matter, Sunoco is not entitled to coverage as an additional insured under the "Grantor of Franchise" endorsement. It is evident when reviewing the documents in the record that Sunoco does not qualify as an additional insured under the "Designated Person or Organization" endorsement to Penn National's [] policy due to the plain language of the policy. The Grantor of Franchise endorsement confines additional insured status to a franchisor that is sued for liability as the grantor of a franchise to one of Penn National's named insured. Penn National did not insure [Greyhound, which was the] franchisee of the gas station involved in the underlying litigation[.] Greyhound was insured and defended in the underlying litigation by its insurer, Nationwide.
>
> Furthermore, Sunoco was not sued in the underlying litigation for liability as the grantor of a franchise to Penn National[']s named

insured, SG II. Sunoco was involved in the underlying litigation as grantor of a franchise to Greyhound, as discussed at length [herein]. This fact is further highlighted in the record in Sunoco's response to Penn National's document requests where Sunoco admitted there was no franchise agreement between Sunoco and SG II on or before the accident date of September 25, 2014.

The record clearly demonstrates that no franchise agreement existed between Sunoco and SG II [] at the time of the underlying incident. As such, Penn National is not required to indemnify Sunoco.

Trial Court Opinion, 11/3/23, at 10-11 (footnotes omitted).

We first examine whether or not the trial court erred in granting summary judgment in favor of Penn National, and against Sunoco, on the claim that Penn National owed a duty to defend Sunoco in the underlying personal injury cause of action. In determining whether or not Penn National maintained a duty to defend Sunoco, we compare the four corners of the complaint filed in the underlying personal injury case to the four corners of the Penn National policy. *Wilcha v. Nationwide Mut. Fire Ins. Co.*, 887 A.2d 1254, 1259 (Pa. Super. 2005) (stating, "to determine whether a claim may potentially come within the coverage of the policy, we must first ascertain the scope of the insurance coverage and then analyze the allegations in the complaint" (citation omitted)); *see also Jerry's Sport Ctr.*, 2 A.3d at 541; *Kvaerner Metals*, 908 A.2d at 896-897.

In the first complaint filed in the underlying personal injury case (identified as Case Number 000960 in the Court of Common Pleas of Philadelphia Country – February Term, 2016), the plaintiff brought a cause of

action for, *inter alia*, negligence against "Defendant-Greyhound and Defendant-Sunoco." **See** Complaint (Underlying Action), 6/29/16, at ¶¶43-47. For purpose of this first underlying complaint, "Defendant-Greyhound" was defined the same as in the case *sub judice*, that is to say Greyhound Aramingo Petroleum Company, Inc. **Id.** at ¶4. "Defendant-Sunoco" was defined collectively as including Sunoco, Inc. and Energy Transfer Partners, L.P. **Id.** at ¶¶7, 10, 13. Thus, Greyhound and Sunoco were named defendants in the first underlying complaint and SG II **was not** a named defendant in the first complaint.

In the second complaint filed in the underlying personal injury case (identified as Case Number 002544 in the Court of Common Pleas of Philadelphia County – September Term, 2016), the plaintiff brought a cause of action for, *inter alia*, negligence against "Defendant-Greyhound." **See** Amended Complaint (Underlying Action), 3/2/17, at ¶¶74-78. For purpose of this second underlying complaint, "Defendant-Greyhound" was defined collectively as including several named parties and, in pertinent part, included Greyhound (as defined herein) and SG II (as defined herein).[8] **Id.** at ¶ 9. Thus Greyhound and SG II were named defendants in the second underlying

---

[8] The plaintiff in the second complaint identified Greyhound (as defined herein) as "Greyhound Aramingo, Inc." with a business address matching the Aramingo Station. Therefore, we deem the named defendant "Greyhound Aramingo, Inc." in the second underlying complaint to be Greyhound, as defined in the case *sub judice*.

complaint and Sunoco **was not** a named defendant in the second underlying complaint. For purpose of litigating the underlying causes of action, the trial court consolidated the two cases.

Sunoco asserts that Penn National owed Sunoco a defense based upon the coverage Penn National provided to SG II.[9] SG II was a named party in the second complaint filed in the underlying personal injury case. Therefore, for purpose of determining whether or not Penn National owed a duty to defend to Sunoco, we examine, and accept as true, the allegations contained in the second complaint filed in the underlying personal injury case, as this is the complaint in which SG II was a named party and upon which Sunoco asserts Penn National owes a duty to defend based upon the Grantor of Franchise Endorsement contained in the Penn National policy.

As discussed *supra*, in the second underlying complaint, "Defendant-Greyhound" is defined as including both Greyhound and SG II. Amended Complaint (Underlying Action), 3/2/17, at ¶9. Greyhound is defined as having a place of business at 2750 Aramingo Avenue, Philadelphia, Pennsylvania 19134. *Id.* at ¶3. SG II is defined as having a place of business

---

[9] As discussed *supra*, SG II was not a named defendant in the first underlying complaint. Because SG II was not a named defendant in the first underlying complaint and the Penn National policy provided coverage only to SG II, and not Greyhound, the Penn National policy was not implicated by the first underlying complaint as providing a potential duty to defend and to indemnify. As such, any defense costs incurred by Sunoco in defending the first underlying complaint, as a named party, would not be recoverable under the Penn National Policy.

at 2025 Greentree Road, Pittsburgh, Pennsylvania 15220. *Id.* at ¶8. In the underlying personal injury cause of action against "Defendant-Greyhound," the plaintiff asserted that

> [Defendant-Greyhound], as the owners, operators, lessors, lessees[,] or entity otherwise in control of the Sunoco station, owed a duty to business invitees to properly regulate and secure the premises, as well as to warn and advise the public, including business invitees such as [plaintiff], of dangerous conditions on the property.

*Id.* at ¶75. Plaintiff defined the "Sunoco station" as "the Sunoco station located at 2750 Aramingo Avenue, Philadelphia, [Pennsylvania] 19134[.]" *Id.* at ¶47. Plaintiff does not use the word "franchisee" to describe Defendant-Greyhound's relationship to the Aramingo Station. Rather, the plaintiff describes that relationship as, *inter alia*, an "entity otherwise in control of the Sunoco station," which could potentially include a franchisee. An entity that controls a Sunoco-branded gas station that is not, itself, Sunoco can reasonably be inferred to be a franchisee. Thus, accepting plaintiff's allegations in the second underlying complaint as true, plaintiff has, for purpose of the case *sub judice*, asserted that Defendant-Greyhound, which included both Greyhound and SG II, may have been a franchisee of the Sunoco Station.

We now compare the four corners of the Penn National policy to the allegations in the second underlying complaint to determine whether or not Sunoco was an additional insured under the Grantor of Franchise

Endorsement.[10]  Pursuant to the Penn National policy (policy number BP9 0660870, effective January 11, 2014, to January 11, 2015), the named insured included SG II and several other related entities, none of which were Greyhound.[11]  **See** Policy Schedule of Names and Addresses (71 0026 0391) at 1.  The Penn National policy included a Grantor of Franchise Endorsement (Endorsement Form 71 0309 0711) that modified Paragraph C – Who is an Insured in Section II - Liability of the Businessowners Coverage Form.  The endorsement modification stated, "The person or organization shown in the Schedule is also an insured, but only with respect to their liability as grantor of a franchise to you."[12]  Sunoco was listed as a grantor of a franchise in the Schedule.  **See** Policy Schedule of Names and Addresses (71 0026 0391) at 1.  Thus, pursuant to the Grantor of Franchise Endorsement, Sunoco was "also

_____

[10] This question differs slightly from the typical inquiry in insurance coverage litigation where a court is tasked with determining whether the nature of the claim leveled in the underlying complaint falls within the scope of coverage described under the relevant policy.  Rather than focus on the scope of coverage, this case requires us to examine whether the claimant, Sunoco, comes within the class of insureds defined by the Penn National policy issued to SG II.

[11] Specifically, the declaration page of the Penn National policy listed the named insureds as follows: SG II (SG II Group, LLC), SG II Pittsburgh, LLC, SG II Pittsburgh Suburban, LLC, SG II Centre, LLC, Greyhound Frankstown Petroleum, LLC, SG II Kraft, LLC, SG II Negley, LLC, and SG II Realty Washington, LLC.

[12] The term "you" was defined as referring to the named insured shown in the policy's declaration page.  Businessowners Coverage Form (BP 00 03 0106) at 1.

an insured" under the Penn National policy "but only with respect to Sunoco's liability as a grantor of a franchise" to one of the named insureds covered under the policy.

Thus, when comparing the four corners of the second underlying complaint to the four corners of the insurance policy, and accepting the allegations contained in the second underlying complaint as true, the allegations potentially give rise to a franchisee-franchisor relationship between SG II and Sunoco and, therefore, Sunoco may be an additional insured under the Penn National policy. As such, we conclude that Penn National, by virtue of its coverage of SG II, which potentially stood as a Sunoco franchisee, owed a duty to defend Sunoco, as a potential franchisor, in the underlying personal injury cause of action.

This duty to defend existed until such time as the claim was narrowed to establish that a franchisee-franchisor relationship did not, in fact, exist between SG II and Sunoco, thus ending the potential coverage of Sunoco as an additional insured under the Penn National policy. In Sunoco's amended objections and responses to Penn National's requests for production of documents and admissions, which was dated March 22, 2021, Sunoco, in response to a question pertaining to the existence of a franchise agreement between Sunoco and SG II, responded,

> Sunoco states that a reasonable search of its records did not reveal any franchise agreement between [Sunoco] and [SG II] on, or at any time prior to[,] September 25, 2014. Based upon this search[,] as well as [Greyhound's and Gorlov's] admission that no

such agreement existed, **Sunoco states that there is no such written franchise agreement dated on or before September 25, 2014.**

Penn National Motion for Summary Judgment, 9/20/21, at Exhibit 5 (emphasis added). Therefore, as of March 22, 2021, it was known by all parties that SG II was not a franchisee of Sunoco and that Sunoco did not qualify as an additional insured under the Penn National policy, thus ending Penn National's duty to defend Sunoco.

To the extent that the trial court considered whether or not a duty to defend existed, we find the trial court erred as a matter of law in granting summary judgment in favor of Penn National and against Sunoco on the duty to defend claim. Rather, a duty to defend existed for a period of time until no genuine issue of material fact existed and it was definitively established that SG II was not a franchisee of Sunoco, that is to say until March 22, 2021. Consequently, we reverse, in part, the portion of the April 27, 2023 order granting summary judgment in favor of Penn National and against Sunoco on the issue of a duty to defend. We remand the case so the trial court may award Sunoco attorneys' fees it incurred in defending the underlying personal injury cause of action[13] from the time Sunoco became engaged in the

_____

[13] Based upon the existence of a duty to defend and Penn National's failure to fulfill that obligation, Sunoco is entitled to recover defense costs associated with the underlying personal injury cause of action, which were not already recovered as an additional insured from Nationwide by virtue of its coverage provided to Greyhound, from the time Sunoco became engaged in the underlying personal injury litigation until March 22, 2021.

underlying litigation until March 22, 2021, when it became clear that a franchisee-franchisor relationship between SG II and Sunoco did not exist and, therefore, Sunoco was not an additional insured under the Penn National policy.

We now turn to an examination of whether or not Penn National owed a duty to indemnify Sunoco in the underlying personal injury cause of action.[14] As discussed *supra*, if the Penn National policy provided Sunoco coverage as an additional insured, it did so only to the extent that Sunoco was the grantor of a franchise to SG II. **See, generally,** Penn National Policy. Our task on appeal, then, is to review the record to determine whether, or not, the trial court erred in concluding that no franchisor-franchisee relationship existed between Sunoco and SG II.

In its amended complaint, Sunoco alleged to have a "dealer supply franchise agreement" with SG II dated 2004 that pertained to "a Sunoco station in Pittsburgh[, Pennsylvania.]" Sunoco Amended Complaint, 7/15/20, at ¶16; **see also id.** at Exhibit A1. The copy of the franchise agreement attached to Sunoco's amended complaint as Exhibit A1, however, reveals a franchise agreement between Sunoco, as the franchisor, and SG II – Nagley

_____

[14] We recognize that once it has been determined that Penn National no longer has a duty to defend Sunoco, it cannot be found that Penn National had a duty to indemnify Sunoco. Nonetheless, we engage in the analysis *infra* because the trial court analyzed only Penn National's duty to indemnify Sunoco. **See** Trial Court Opinion, 11/3/23, at 11 (stating, "Penn national is not required to indemnify Sunoco").

Ave. LLC, as franchisee. *Id.* at Exhibit A1. The Penn National policy shows that this franchise agreement relates to a Sunoco-branded gas station and convenience store located on Negley Avenue in Pittsburgh, Pennsylvania. The second complaint filed in the underlying personal injury case identified SG II as having a business location of 2025 Greentree Road, Pittsburgh, Pennsylvania. That location, under the Penn National policy, was not identified as a "convenience food and gasoline station" like the other named insureds under the policy but, rather, was identified as an "accounting, auditing, or bookkeeping firm." *See* Penn National Policy. Therefore, SG II – Nagley Ave. LLC was not the same entity identified as SG II herein. The franchise agreement attached to Sunoco's amended complaint did not demonstrate a franchise agreement between Sunoco and SG II and, more importantly, did not supply any reason to believe Sunoco was alleged to be liable in the underlying personal injury cause of action because it entered into a franchisor-franchisee agreement pertaining to another gasoline station. Moreover, in its amended complaint, Sunoco alleged that the franchise agreement that covered the Aramingo station was entered into with Greyhound as the franchisee. Sunoco Amended Complaint, 7/15/20, at ¶17; *see also id.* at Exhibit B1.

The record further reveals that the Philadelphia area division manager for Sunoco testified in a deposition that she was the division manager during the time period involving the underlying incident. N.T., 6/30/21, at 11.

During her tenure as division manager, she was "responsible for all of the franchise locations in and around the City of Philadelphia and the five [surrounding] counties." *Id.* When asked to identify the franchisee for the Aramingo Station at the time of the incident, the division manager identified Greyhound as the franchisee. *Id.* at 26. The division manager further explained that Greyhound was the only entity who was obligated, as the franchisee, to maintain insurance coverage on the Aramingo Station, pursuant to the Franchise Agreement. Furthermore, the liability risk and claims manager for Sunoco stated in her deposition that the franchisee for the Aramingo Station was Greyhound. N.T., 7/21/21, at 8-9, 13. Finally, in Sunoco's response to Penn National's request for the production of documents and admissions, Sunoco admitted that

> a reasonable search of [Sunoco's] records did not reveal any franchise agreement between [Sunoco] and [SG II] on, or at any time prior to[,] September 25, 2014. Based on this search [,] as well as [Greyhound's and Gorlov's] admission that no such agreement existed, Sunoco states that there is no such written franchise agreement dated on or before September 25, 2014.

Penn National's Motion for Summary Judgment, 9/20/21, at Exhibit 5.

We concur with the trial court that, based upon the admission of Sunoco and the certified record before us, Penn National is entitled to summary judgment on the claim of indemnification. Thus, we discern no abuse of discretion or error of law in the trial court order granting summary judgment in favor of Penn National and dismissing Sunoco's claim for indemnification.

- 32 -

**1532 EDA 2023**

In the cross-appeal, Greyhound challenges the portion of the trial court's April 27, 2023 order that granted summary judgment in favor of Sunoco and against Greyhound. Greyhound Brief (1532 EDA 2023) at 21-58. Greyhound asserts that the indemnification clause contained in the Franchise Agreement "does not meet the requirements of the **Perry-Ruzzi** rule" in that the indemnification clause "is void of any provision explicitly stating that Greyhound was required to indemnify Sunoco for Sunoco's own negligent conduct."[15] **Id.** at 21, 24. According to Greyhound, the language that states Greyhound is not required to indemnify Sunoco for claims caused **solely by the negligence** of Sunoco does not evidence "express language to support a finding that the parties intended for Greyhound to indemnify Sunoco for its own negligence" as required by the **Perry-Ruzzi** rule. **Id.** at 24-25.

Alternatively, Greyhound asserts that if the indemnification clause satisfies the **Perry-Ruzzi** rule then Sunoco was required to prove Greyhound was negligent in the underlying personal injury cause of action to establish Sunoco's right to indemnification because the underlying personal injury case settled before a jury determined which parties, if any, were liable, and to what

---

[15] The **Perry-Ruzzi** Rule, as discussed in greater detail *infra*, requires that "if parties intend to include within the scope of their indemnity agreement a provision that covers losses due to the indemnitee's own negligence, they must do so in clear and unequivocal language." **Ruzzi v. Butler Petroleum Co.**, 588 A.2d 1, 4 (Pa. 1991); **see also Perry v. Payne**, 66 A 553, 557 (Pa. 1907).

extent.  *Id.* at 34-37.  Greyhound argues that because the underlying litigation was resolved *via* settlement, Sunoco, in moving for summary judgment in the case *sub judice*, assumed the role of the plaintiff in the underlying personal injury cause of action and, therefore, was required to prove Greyhound's negligence in bringing about the plaintiff's personal injury. *Id.* at 37-38.  Greyhound contends that the underlying personal injury cause of action "alleged that both Greyhound and Sunoco were jointly and severally liable because [] the pumping mechanisms at the Aramingo Station were not safely designed, and that [the pumping mechanisms] failed to adhere to safety standards set in place by the highly regulated industry of delivering flammable fuel to consumers, or that such standards were insufficient."  *Id.* at 38-39. Greyhound argues that because the negligence claims in the underlying personal injury case "go far beyond the general knowledge of a layperson[,]" Sunoco was required to submit expert reports to support its motion for summary judgment.  *Id.* at 39-40.  Because Sunoco failed to present expert evidence establishing Greyhound's negligence in the underlying personal injury case, Greyhound concludes that the trial court erred in granting summary judgment in favor of Sunoco.  *Id.* at 40-47.

Finally, Greyhound asserts that a 2019 Distribution Agreement between Sunoco and United Energy Distributors LLC ("United Energy") "became the operative binding agreement of the parties as it relates to the purchase and resale of Sunoco-branded motor fuel by Greyhound."  *Id.* at 48.  Upon

entering into the Distribution Agreement in 2019, Sunoco, according to Greyhound, "unequivocally cancelled the prior [] Franchise Agreement [between Sunoco and Greyhound] and released any claims related thereto." *Id.* Because the Franchise Agreement was cancelled by the Distribution Agreement, Greyhound asserts that the indemnification clause in the Franchise Agreement was no longer appliable and Sunoco was not entitled to summary judgment in its favor. *Id.* at 48-58.

We begin by addressing Greyhound's argument that the 2019 Distribution Agreement "cancelled" the Franchise Agreement between Greyhound and Sunoco, thereby making the indemnification clause inoperable. The Distribution Agreement, executed September 3, 2019, was an agreement between Sunoco and United Energy under which Sunoco would sell and United Energy would purchase Sunoco-branded motor fuel. *See* Distribution Agreement, 9/3/19. The purpose of the Distribution Agreement was, *inter alia*, to permit United Energy to purchase Sunoco-branded motor fuel from Sunoco and resell that fuel to, *inter alia*, Sunoco retailers. *Id.* (stating, "[United Energy's] purchase and resale of [Sunoco's m]otor [f]uel to Distributor's and Retailer's locations is the essence of this [Distribution] Agreement"). Greyhound was not a party to the Distribution Agreement. Rather, Greyhound was identified as a "retailer location" to which United Energy was permitted to resell Sunoco-branded motor fuel under the Distribution Agreement. *Id.*

Under the terms of the Franchise Agreement between Sunoco and Greyhound, Sunoco agreed, *inter alia*, to "make available for sale [to Greyhound, Sunoco-]branded motor fuels" that Greyhound would, in turn, resell to its customers. **See** Franchise Agreement, 10/1/13 (stating, "[t]he essence of this [Franchise] Agreement is [Greyhound's] purchase and resale of [Sunoco-]branded motor fuel to [Greyhound's] customers"). The Franchise Agreement stated that the agreement could not be modified unless the modification was in writing and signed by Sunoco's authorized representative. *Id.*

Upon review, we find Greyhound's reliance on the Distribution Agreement as a contract cancellation mechanism to be misplaced. Foremost, the Distribution Agreement is an agreement between Sunoco and United Energy for the distribution and resale of Sunoco-branded motor fuel to retailers, *i.e.*, franchisees, such as Greyhound. In other words, the Distribution Agreement was a means by which Sunoco "moved" its branded motor fuel product into the hands of its franchisee retailers. Greyhound was not a party to the Distribution Agreement. As such, the Distribution Agreement did not cancel or modify the Franchise Agreement that was in place between Sunoco and Greyhound at the time of the incident. Therefore, we discern no error of law or abuse of discretion in the trial court's determination that "the plain language of the United Energy [Distribution] Agreement demonstrates that the Franchise Agreement between Sunoco and Greyhound

- 36 -

was not cancelled or modified." Trial Court Opinion, 11/3/23, at 7 (footnote omitted).

Turning to Greyhound's argument that the trial court erred in granting summary judgment in favor of Sunoco as to its right to indemnification, "[a]n agreement to indemnify is an obligation resting upon one person to make good a loss which another has incurred or may incur by acting at the request of the former, or for the former's benefit." ***Burlington Coat Factory of Pennsylvania, LLC v. Grace Constr. Mgmt. Co., LLC***, 126 A.3d 1010, 1022 (Pa. Super. 2015) (*en banc*) (citation and original quotation marks omitted).

> Indemnity agreements are to be narrowly interpreted in light of the parties' intentions as evidenced by the entire contract. In interpreting the scope of an indemnity clause, the court must consider the four corners of the document and its surrounding circumstances.

***Id.*** (citations and quotation marks omitted).

"The law has been well[-]settled in this Commonwealth for [117] years that if parties intend to include within the scope of their indemnity agreement a provision that covers losses due to the indemnitee's own negligence, they must do so in clear and unequivocal language. No inference from words of general import can establish such indemnification." ***Ruzzi***, 588 A.2d at 4, *relying on* ***Perry***, 66 A at 557; ***see also Greer v. City of Philadelphia***, 795 A.2d 376, 379 (Pa. 2002); ***Bernotas v. Super Fresh Food Mkts., Inc.***, 863 A.2d 478, 482-483 (Pa. 2004). Pursuant to this rule of law, commonly referred to as the ***Perry-Ruzzi*** Rule, "a contract of indemnity against personal

injuries [will] not be construed to indemnify against the negligence of the indemnitee, unless it is so expressed in unequivocal terms." ***Ruzzi***, 588 A.2d at 4. The ***Perry-Ruzzi*** Rule is applicable "only in those situations where a party seeks indemnification for its own negligence." ***Mace v. Atl. Refin. Mktg. Corp.***, 785 A.2d 491, 496 (Pa. 2001).

To establish a right to indemnification, the indemnitee must establish (1) the scope of the indemnification agreement, (2) the nature of the underlying claim, (3) that the underlying claim fell within the scope of the indemnification agreement, (4) that the attorneys' fees, incurred by the indemnitee in defending against the underlying claim, were reasonable, and (5) where the underlying cause of action is settled rather than resolved by payment of judgment, the underlying claim was valid against the indemnitee and the settlement was reasonable. ***Burlington***, 126 A.3d at 1022; ***see also McClure v. Deerland Corp.***, 585 A.2d 19, 23 (Pa. Super. 1991); ***Martinique Shoes, Inc. v. New York Progressive Wood Heel Co.***, 217 A.2d 781, 782-784 (Pa. 1966).

In the case *sub judice*, the indemnification clause in the Franchise Agreement states, in pertinent part, as follows:

**3.14.1 INDEMNIFICATION**

A.   [Greyhound] shall fully protect, defend, reimburse, indemnify[,] and save harmless [Sunoco], its parent, its subsidiaries, affiliates[,] and all of their employees from and against any and all claims, liabilities, losses, damages, demands, fines, [and] causes of action of every kind and character from any cause whatsoever, including injury to

person and property (including death) of [Greyhound, Greyhound's] employees, agents, contractors, customers, invitees[,] and other persons caused by or resulting in any way from:

(1) Operation of [Greyhound's] business, including but not limited to operation, condition[,] and use of the [Aramingo Station] (*e.g.*[,] driveways, walkways[,] and signs)[,] and service and repair of motor vehicles by [Greyhound, Greyhound's] employees, agents[,] and contractors;

(2) Performance or non-performance of [Greyhound's] obligations under this [Franchise] Agreement.

(3) Operation, use, condition[,] or state of repair of the loaned equipment, the UST system, motor fuel dispensing equipment, oil/water separators, the building fixtures and improvements, and motor vehicles under [Greyhound's] care, custody[,] or control;

(4) Loss, discharge[,] or spill of petroleum products on or from the [Aramingo Station] (excluding loss, discharge[,] or spill caused by [Sunoco] or its carriers while delivering motor fuels to the [Aramingo Station]);

(5) Contamination, mixing[,] and dispensing of products by [Greyhound, Greyhound's] personnel, customers[,] and suppliers (excluding [Sunoco] and its contractors);

(6) Claims and demands of [Greyhound's] employees, agents, and contractors for compensation, wages, benefits[,] and other remuneration, including fines, interest, and penalties assessed by appropriate governmental authorities, in any way associated with payment or nonpayment of such remuneration;

(7) Claims and demands of governmental taxing authorities, including taxes, fines, interest[,] and penalties associated with payment, nonpayment, reporting[,] or non-reporting of taxes and

assessments owed by [Greyhound] or [Greyhound's] business;

(8)    Acts and omissions of [Greyhound, Greyhound's] personnel, contractors[,] and customers whereby [Sunoco's] licenses or permits are, or could be, cancelled by governmental authority.

B.    [Greyhound] shall further indemnify and reimburse [Sunoco] for:

(1)    Costs, expenses[,] and fees (including court costs and reasonable attorney[s'] fees) incurred by [Sunoco] relating to litigation undertaken successfully by [Sunoco] against [Greyhound] to enforce, terminate or non-renew this [Franchise] Agreement, or to collect money or recover equipment and property due [Sunoco] by [Greyhound].

(2)    Costs, expenses, fees (including court costs, attorney[s'] fees, and costs of litigation), taxes, fines, penalties[,] and judgments incurred or paid by [Sunoco] by reason of violation of law or regulations by [Greyhound].

C.    The parties hereto agree that, in consideration of [Sunoco's] execution of this [Franchise] Agreement, any claim of any kind by [Greyhound] based on or arising out of this [Franchise] Agreement or otherwise shall be barred unless asserted by [Greyhound] by commencement of an action within [12] months after delivery of the products or other event, action[,] or inaction to which the claim relates.  This provision shall survive termination of this [Franchise] Agreement.

D.    All amounts due [Sunoco] by [Greyhound] by reason of indemnities and obligations imposed upon [Greyhound] by this [Franchise] Agreement shall become due and payable by [Greyhound] to [Sunoco] upon demand, as part of [Greyhound's] account to [Sunoco].

E.    Notwithstanding the provisions elsewhere set forth above, [Greyhound] shall not be liable to [Sunoco], and does not protect, indemnify[,] or save harmless [Sunoco] for claims,

> losses[,] or damages **caused solely by the negligence of**
> [Sunoco], its employees, contractors[,] and agents.

Franchise Agreement, 10/1/13, at § 3.14.1 (extraneous capitalization omitted; emphasis added).

In granting summary judgment in favor of Sunoco and against Greyhound, the trial court stated:

> [The trial] court finds that Sunoco [] established as a matter of law that the Franchise Agreement requires Greyhound to indemnify Sunoco for the [underlying personal injury cause of action. The] plain language of the Franchise Agreement [indemnification] clause provides that "Greyhound shall not be liable to Sunoco . . . for claims, losses[,] or damages, caused solely by the negligence of Sunoco . . . [.]" It is undisputed that the injuries that gave rise to this matter were the result of a car accident caused by non-party business invitees to Greyhound's [Aramingo Station]. As these facts are undisputed it is evident that Sunoco could not have been the sole cause of the negligence as a third non-party's actions were at a minimum partially responsible. As such, Sunoco is entitled to summary judgment as a matter of law.

Trial Court Order, 4/27/23, at ¶1 n.1 (extraneous capitalization and original brackets omitted); **see also** Trial Court Opinion, 11/3/23, at 5-6. The trial court further explained that the "Franchise Agreement [indemnification] clause specifically uses the terminology as denoted in **Woodburn** [**v. Consolidation Coal Co.**, 590 A.2d 1273 (Pa. Super. 1991), *appeal denied*, 600 A.2d 955 (Pa. 1991), *overruled on other grounds by* **Leonard v. Commonwealth of Pennsylvania, Dept. of Transp.**, 771 A.2d 1238, 1241 n.2 (Pa. 2001)] that Greyhound is not liable only when Sunoco is solely negligent. As such, **Woodburn**[, **supra**,] clearly dictates that Greyhound

- 41 -

must indemnify Sunoco as they were not solely negligent in this matter." Trial Court Opinion, 11/3/23, at 6 (footnote omitted).

In **Woodburn**, **supra**, Woodburn sustained serious and permanent injuries when he fell to the ground in a construction-related accident while working at a facility owned by Consolidation Coal Company ("Consol"). **Woodburn**, 590 A.2d at 1274. As part of the construction project, Consol hired Industrial Resources, Inc. ("Industrial") as the general contractor, who in turn hired Mohawk Construction and Supply Company ("Mohawk") as a subcontractor. **Id.** Mohawk then subcontracted some of its duties to Woodburn's employer. **Id.** A jury awarded Woodburn $8,000,000.00 in damages and found, *inter alia*, that Industrial was 45% responsible and Mohawk was 35% responsible for Woodburn's injuries under a negligence theory of recovery.[16] **Id.** Post-trial, the trial court found that Mohawk was contractually obligated to indemnify Industrial pursuant to the indemnification clause contained in the contractor-subcontractor agreement between Industrial and Mohawk. **Id.** at 1274-1275. The indemnification clause contained in the contractor-subcontractor agreement read, in pertinent part, as follows:

> [Mohawk] shall assume all risks of the premises and shall indemnify and hold harmless Consol and Industrial, their

_____

[16] The remaining 20% of liability was assigned to the manufacturer of the stirrups that, due to a defect, permitted scaffolding to fall thereby resulting in Woodburn's injuries. **Woodburn**, 590 A.2d at 1274.

directors, officers[,] and employees, from and against any and all claims and/or demands including all costs and expenses, including attorney[s'] fees, for injury or alleged injury or death to persons, or damage to property, caused by, arising from, incidental to, connected with[,] or growing out of the work to be performed under this construction agreement, including, but not limited to, any work to be performed by [Mohawk] or [an] agent of [Mohawk]; provided, however, that such indemnification and hold harmless shall not apply to claims for injury or alleged injury or death to persons, or damage to property (other than loss of, damage to, or loss of use of [Mohawk's] property) **caused by the sole negligence of** Consol or [Industrial.]

*Id.* at 1275 (emphasis added). On appeal, this Court, in finding that the indemnification clause satisfied the **Perry-Ruzzi** Rule, stated

we find that Industrial and Mohawk expressly agreed, by the terms of their contract, and intended, that Mohawk would indemnify Industrial against any and all claims arising from the work to be conducted under the contract, except for any injuries caused by the "sole negligence" of Industrial. Since a jury found Industrial to be less than 100% negligent, Mohawk is contractually bound to indemnify Industrial.

*Id.* at 1276. In so holding, this Court agreed that the negative inference to be drawn from the indemnification clause provision - "caused by the sole negligence of [Industrial]" - was "that any injuries occurring by less than the sole fault of Industrial fall within the scope of the indemnification clause" and that use of this provision in the indemnification clause satisfied the **Perry-Ruzzi** Rule. *Id.* at 1275-1276.

In examining whether the indemnification clause contained in the Franchise Agreement in the case *sub judice* satisfies the **Perry-Ruzzi** Rule, we concur with the trial court, and the record supports, that the use of the

provision "**caused solely by the negligence of [Sunoco]**" specifically and expressly denotes Greyhound's intent to indemnify Sunoco for damages **except** when the damages were caused solely by Sunoco's negligence. In other words, Greyhound intended to indemnify Sunoco for damages resulting from causes other than the sole negligence of Sunoco. *See id.*

As discussed *supra*, in order to demonstrate a right to indemnification and, in turn, entitlement to summary judgment, Sunoco was required to establish that the underlying claim fell within the scope of the Franchise Agreement's indemnification clause, that its attorneys' fees were reasonable, and, because the underlying claim was settled, that the claim against Sunoco was valid and the settlement was reasonable. *See Burlington*, 126 A.3d at 1022. It is undisputed that, pursuant to the Franchise Agreement, Greyhound agreed to indemnify Sunoco for personal injury to Greyhound's invitees (*i.e.*, the plaintiff in the underlying litigation) that was caused by, *inter alia*, the operation and use of the Aramingo Station and the operation, use, and condition of*, inter alia*, the gasoline pumps at the Aramingo Station. *See* Franchise Agreement, 10/1/13, at § 3.14.1(A)(1) and (3). It is further undisputed that the plaintiff in the underlying case suffered injuries when a third-party vehicle drove into the plaintiff's vehicle and the gasoline pumps, thereby igniting a fire at the gasoline pump the plaintiff was using while at the Aramingo Station. *See* Greyhound Motion for Summary Judgment, 9/20/21, at ¶¶7, 35. Therefore, we concur with the trial court, and the record supports,

that the underlying negligence claim against, *inter alia*, Sunoco falls within the scope of the Franchise Agreement's indemnification cause. In order words, the plaintiff's claim that she was injured while pumping Sunoco-branded motor fuel into her vehicle at the Aramingo Station falls within the scope of the indemnification clause.

In granting summary judgment in favor of Sunoco, and against Greyhound, the trial court found that Sunoco was not solely responsible for the underlying plaintiff's injuries but, rather, at a minimum, the driver of the vehicle was also partially responsible for those injuries. Trial Court Order, 4/27/23, at ¶1 n.1 (stating, "it is evident that Sunoco could not have been the sole cause of the negligence as a third non-party's actions were at a minimum partially responsible"). Thus, the trial court considered the validity of the underlying claim against Sunoco and attributed a portion of the liability to Sunoco's negligence. As such, we concur with the trial court, and the record supports, that no genuine issue of material fact existed as to Sunoco's entitlement to indemnification of a reasonable settlement amount and reimbursement of reasonable attorneys' fees. ***See Burlington***, 126 A.3d at 1022; ***see also*** Trial Court Order, 4/27/23, at ¶1 and n.1; Trial Court Opinion,

11/3/23, 5-7.  Consequently, we affirm the portion of the April 27, 2023 order granting summary judgment in favor of Sunoco and against Greyhound.[17]

**Conclusion**

In sum, regarding the appeal filed with this Court at 1403 EDA 2023, we affirm the portion of the April 27, 2023 order granting summary judgement in favor of Gorlov and against Sunoco.  At the appeal filed with this Court at 1404 EDA 2023, we reverse the portion of the April 27, 2023 order granting summary judgment in favor of Penn National and denying Sunoco's motion for summary judgment on Sunoco's claim of a duty to defend.  On remand, the trial court shall award Sunoco attorneys' fees in accordance with this

_____

[17] In granting summary judgment in favor of Sunoco and against Greyhound, the trial court did not determine the amount of indemnification Sunoco was entitled to receive but, rather, determined only that Sunoco was entitled to receive indemnification of a reasonable settlement amount and reasonable attorneys' fees.

After granting summary judgment in favor of Sunoco and against Greyhound, and upon Sunoco subsequently filing a motion to assess damages, the trial court conducted a hearing and, ultimately, entered judgment against Greyhound in the amount of $2,288,802.76.  **See** Trial Court Order, 5/18/23.

In Greyhound's cross-appeal, we are asked only to review the trial court's order granting summary judgment in favor of Sunoco and against Greyhound. In other words, we are tasked with reviewing whether, or not, Sunoco was entitled to indemnification of a reasonable settlement amount and reasonable attorneys' fees.

Because Greyhound did not appeal the May 18, 2023 judgment, our disposition of Greyhound's cross-appeal does not include a review of the trial court's determination of what constituted a reasonable settlement amount and reasonable attorneys' fees.

opinion. At that same appeal, we affirm the portion of the April 27, 2023 order granting summary judgment in favor of Penn National and against Sunoco on Sunoco's claim of indemnification. Finally, at the cross-appeal filed with this Court at 1532 EDA 2023, we affirm the portion of the April 27, 2023 order granting summary judgment in favor of Sunoco and against Greyhound.

Order affirmed, in part, and reversed, in part. Case remanded. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 8/07/2024